```
                   UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA

  * * * * * * * * * * * * * * *
UNITED STATES OF AMERICA,          )  Criminal Action
                                   )  No. 2021-78
vs.                                )
                                   )
JOHN EARLE SULLIVAN,               )  February 16, 2021
                                   )  4:01 p.m.
              Defendant.           )  Washington, D.C.
                                   )
  * * * * * * * * * * * * * * *
```

**TRANSCRIPT OF HEARING**
**BEFORE THE HONORABLE ROBIN M. MERIWEATHER,**
**UNITED STATES DISTRICT COURT MAGISTRATE JUDGE**
**(Parties appearing via videoconference and telephonically)**

**APPEARANCES:**

```
FOR THE UNITED STATES:   CANDICE WONG
                         U.S. Attorney's Office
                         for the District of Columbia
                         555 Fourth Street, NW
                         Washington, DC 20530
                         (202) 252-7849
                         Email: candice.wong@usdoj.gov

FOR THE DEFENDANT:       STEVEN ROY KIERSH
                         5335 Wisconsin Avenue, NW
                         Suite 440
                         Washington, DC 20015
                         (202) 347-0200
                         Email: skiersh@aol.com

ALSO PRESENT:            MASHARIA HOLMAN, Pretrial Officer
                         JOSHUA CAHOON, U.S. Probation

Court Reporter:          Elizabeth Saint-Loth, RPR, FCRR
                         Official Court Reporter
```

Proceedings reported by machine shorthand, transcript
produced by computer-aided transcription.

**P R O C E E D I N G S**

1          THE COURT:  Okay.  I am ready.

2          THE DEPUTY:  Okay.

3          Criminal Case No. 2021-78, the United States of

4   America versus John Earle Sullivan.

5          Candice Wong representing the government;

6   Steven Kiersh representing the defendant.  Shay Holman is

7   the pretrial services officer.  The defendant is

8   participating by video.  This case is called for a hearing

9   to set conditions of release.

10          Also, Your Honor, just to let you know, Josh

11   Cahoon is also connected by video.

12          THE COURT:  Thank you.

13          I set this hearing to set release conditions given

14   that I know we had some concerns at the last hearing with

15   the proposed conditions, specifically with a proposal to

16   adopt the conditions that were set by the arresting

17   jurisdiction which subjected Mr. Sullivan to an internet

18   monitoring system supervised by pretrial services in Utah

19   and -- pursuant to which -- that court's release conditions

20   where, in fact, Mr. Sullivan was banned from certain

21   websites that discussed the specific nature which were not

22   set forth in the Court's release order but, instead, were

23   determined by pretrial based on its assessment of sites that

24   potentially posed some risks.

1          I invited the parties that -- if I were going to

2     be asked to invoke limits on use of websites, it would need

3     to be presented directly to me for me to resolve in the

4     release order; both for clarity of the record, because I

5     know that there were some extra steps involved in trying to

6     review the revocation, but then, also, it was -- in my aim

7     to finish within the time limits we had, it was probably not

8     explained as fully on the record.  But, also, I wasn't aware

9     that he -- of the restrictions of the potential First

10    Amendment implications; and I wanted to make sure that

11    anything that I did set was specifically justified by the

12    government and, also, appropriately tailored to the concerns

13    that we have to consider under the Bail Reform Act when we

14    are setting release conditions.

15          Before we called the case, I was advised by the

16    defense that they had filed a memorandum concerning release

17    conditions and that memorandum, which I reviewed before we

18    called the case, raised First Amendment concerns, and it

19    indicated their objections to the release conditions.

20          I think the best way to proceed today, for clarity

21    of the record, given the extent of time since our last

22    hearing, would be for Ms. Wong to first state exactly what

23    release conditions the government is requesting.  I will

24    then let Mr. Kiersh indicate exactly which of those

25    conditions the defense objects to.

1         If I have questions for pretrial services about

2     implementation or logistics of any of the conditions that

3     are being proposed or any recommendations from pretrial, I

4     will hear from pretrial; and that can be our pretrial or

5     Mr. Cahoon who has graciously agreed to participate from

6     pretrial; and then, hopefully, I will have enough

7     information in front of me to decide.

8         I realize that the question of Mr. Sullivan's

9     release has been pending for some period of time.  And I

10    presume that, while it's been pending, he has been subject

11    to all of the restrictions by the arresting jurisdiction and

12    that that Court can modify the order in the interim.

13        So, Ms. Wong, if you could just go through one by

14    one the conditions you are requesting.  Thank you.

15             MS. WONG:  Yes, Your Honor.

16             Candice Wong for the United States.

17             Thank you, Your Honor.

18        I did ask at the last hearing for us to reimpose

19    the conditions in Utah, but Your Honor did ask us to confer

20    with the parties.  I have spoken with Mr. Kiersh over the

21    weekend, as well as Mr. Cahoon and Ms. Holman from pretrial,

22    and have a modification to what I was requesting initially.

23        I would say I do believe that pretrial and the

24    government are in alignment here.  We have, sort of, two

25    possibilities or alternatives with respect to the social

1    media that we would propose.  But, essentially, the

2    conditions would include the home detention, which is what

3    was imposed in the arresting jurisdiction; that would

4    include GPS monitoring, as was imposed in the arresting

5    jurisdiction; it would include computer and internet

6    monitoring; and there are some miscellaneous ones, Your

7    Honor, involving firearms.

8              Do you want me to go through --

9              THE COURT:  Yes.  I think it would just be helpful

10   to go through each one.  I am going to write it down and

11   make sure I know which ones are in dispute.

12             MS. WONG:  Let me just grab the order.

13             THE COURT:  Take your time.

14             MS. WONG:  Yes, Your Honor.

15             He was asked -- okay, Your Honor, starting from

16   the beginning, that:  The defendant must maintain or

17   actively seek verifiable employment and/or maintain or

18   commence an educational program as approved by the pretrial

19   officer.

20             The Court, I believe, had added in there some

21   language about Insurgence USA.  The government here would

22   request some more specific language than what we were

23   requesting there; it's that the defendant must actively seek

24   or maintain verifiable employment as approved by the Court;

25   can no longer do any work for Insurgence USA to include any

1    promotion, affiliation with, marketing of, or communication

2    through Insurgence USA, InsurgenceUSA.com, or Insurgence USA

3    social media channels, accounts, or handles.

4            All activity relating to Insurgence USA is

5    prohibited, except for the payment of taxes and maintenance

6    of existing bank accounts.

7            THE COURT:  One minute.  Let me make sure I finish

8    writing this down.

9            All activity regarding Insurgence USA is

10   prohibited except for paying taxes -- and doing what?

11           MS. WONG:  Maintenance of existing bank accounts.

12           And, Your Honor, that is the same language that

13   was delivered from the bench but was not in the order; and

14   so that was my attempt to provide it, the language in the

15   order.

16           THE COURT:  Okay.

17           MS. WONG:  Another restriction is that the

18   defendant abide by restrictions on his place of abode or

19   travel which include maintaining his residence and not

20   changing without prior permission from his supervision

21   officer, not traveling out of state without prior permission

22   from his supervision officer, not traveling outside the

23   United States without prior permission from the Court.

24           The next restriction is:  Avoid all contact with

25   those named persons who are considered either alleged

1    victims, potential witnesses, and/or codefendants.

2            The next condition is:  Report on a regular basis

3    to the supervision officer as directed.  The next condition

4    is:  Not to possess a firearm, ammunition, destructive

5    device, or any other dangerous weapon.

6            The next condition was:  Do not use or unlawfully

7    possess a narcotic drug and other controlled substances

8    unless prescribed.

9            The next condition was:  Undergo mental health

10   evaluation and complete any recommended treatment as

11   directed by the supervision officer.  I don't know if that's

12   already been done.

13           The next condition is:  Surrender any passport to

14   the Clerk of Court in the District of Utah.  I believe that

15   would have been done already, but Mr. Kiersh can confirm.

16           The next condition is:  Not obtain or apply for a

17   passport.

18           The next condition is:  Home detention, as I

19   mentioned.  After that is:  GPS location monitoring, as I

20   mentioned.

21           The next condition is:  The computer and internet

22   monitoring program, as administered by Mr. Cahoon's agency.

23   And with respect to that, the government's request would be

24   that the Court prohibit the defendant from his use of

25   Twitter and Facebook and encrypted social media platforms.

```
 1              As one alternative to that, Your Honor, something
 2      Ms. Holman has discussed or considered was not limiting the
 3      platforms but, instead, potentially -- if Your Honor
 4      preferred an approach that encompassed more platforms but
 5      perhaps was more narrowly tailored to communications to
 6      prohibit:  Inciting, promoting, or organizing protests,
 7      riots, criminal activity, armed conflicts, or violence on
 8      any social media platform.  I think they both have different
 9      issues, and I am happy to discuss them; but those are two
10      possibilities adjusted for social media.
11              THE COURT:  With that alternative, it was
12      prohibiting:  Inciting, promoting, or organizing protests
13      riots, or -- what else?
14              MS. WONG:  Criminal activity, armed conflicts, or
15      violence.
16              THE COURT:  Thank you.
17              Were there any other conditions you were asking
18      for?
19              MS. WONG:  I believe that's it, Your Honor.
20              There is something about appearing in court which
21      is one of the standard ones.
22              THE COURT:  Yes.  That has been the standard form,
23      appear in Court as required, and not commit any federal,
24      state, or local crimes.
25              MS. WONG:  Correct, Your Honor.
```

1          THE COURT:  Thank you.

2          Does pretrial wish to be heard any further -- or

3     wish to be heard on what Ms. Wong's recommending?

4          If there is something you want to address later,

5     you may.  But, just preemptively, was there anything at this

6     juncture?

7          MS. HOLMAN:  Your Honor, this is Ms. Holman with

8     pretrial services.

9          Mr. Cahoon may want to confirm this, but there was

10    also a condition that said:  Submit person, residence, or

11    office, or vehicle to search conducted by a pretrial officer

12    at a reasonable time upon reasonable suspicion of contraband

13    or evidence of a violation of conditions of release.

14         THE COURT:  Okay.

15         THE DEPUTY:  Excuse me.

16         MS. HOLMAN:  And I think that goes to the possible

17    use of having the cell phones and other computer equipment

18    in the home, Your Honor.

19         THE COURT:  Ms. Kay?

20         THE DEPUTY:  Excuse me, just one moment.

21         I just want to remind everyone if you could mute

22    your telephone if you are not speaking, if you are able to

23    do that.  Most everyone is muted; but I don't know if people

24    on the telephone are able to mute if they are not speaking.

25    That's a request by the court reporter.

1          Thank you.

2          THE COURT:  Ms. Holman, it was:  Submit person,

3  vehicle, or residence to search at a reasonable time upon

4  grounds of suspected violation?

5          MS. HOLMAN:  Yes, Your Honor; reasonable suspicion

6  of contraband or evidence of a violation of a condition of

7  release.

8          It was part of the original conditions of release.

9          THE COURT:  Thank you.

10         Ms. Wong, are you requesting that condition as

11  well to carry forward?

12         MS. WONG:  Yes, Your Honor.  I am just seeing it

13  now; I didn't mean to omit that.

14         THE COURT:  Okay.  Thank you.

15         Okay.  Ms. Holman, was there anything else from

16  pretrial, or Mr. Cahoon?

17         MS. HOLMAN:  Not from D.C. pretrial, Your Honor.

18         THE COURT:  Mr. Cahoon is muted.

19         Mr. Cahoon, could you just unmute yourself and

20  confirm at this juncture whether there is anything you

21  wanted to add?

22         MR. CAHOON:  I do not believe so, Your Honor.

23         I was not aware though if I heard a mental health

24  evaluation had been recommended; that was one of the

25  conditions that was originally ordered.

```
1              THE COURT:  What type of evaluation, mental

2    health?

3              MR. CAHOON:  The specific wording was:  Undergo a

4    mental health evaluation, and complete any recommended

5    treatment as directed by the pretrial officer; take any

6    mental health medication as prescribed; and the defendant

7    shall pay part or all of the cost of the program based upon

8    ability to pay as determined by the pretrial officer.

9              THE COURT:  Thank you.

10             Okay.  Mr. Kiersh, I take it from your memorandum

11   that you object to GPS monitoring and any restriction on

12   social media.

13             Are there other of these proposed conditions that

14   the defense objects to?

15             MR. KIERSH:  Thank you, Your Honor.

16             Again, Steven Kiersh appearing remotely on behalf

17   of John Sullivan, and Mr. Sullivan is present remotely.

18             And we did submit, as the Court has noted, a

19   detailed written memorandum concerning our objections based

20   upon First Amendment grounds.

21             We strenuously object to the representations made

22   today both by pretrial services and Ms. Wong.  The

23   recommendations they're making are totally oppressive;

24   they're unconstitutional; they're overbroad; they're

25   inconsistent with the purposes and designs of the statute
```

1      governing pretrial release.  I will take them one by one.

2             Again, there are a few exceptions that we don't

3      object to but the vast majority, again, we strenuously

4      object to; and we'll go through them.

5             Number one, let's talk about no longer working for

6      Insurgence USA; this is how Mr. Sullivan makes his living.

7      We've submitted receipts to the Court, they're also provided

8      to the government -- demonstrating that he has active

9      contracts, legitimate contracts, related to his work with

10     Insurgence USA.  There is no reason to limit this young

11     man's employment.  He is actively employed.  There is no

12     connection with the crimes that are charged in the

13     indictment with his activities working with Insurgence USA.

14            No, he is not going to be committing any criminal

15     activity because those, naturally, are prohibited.  But the

16     legal purposes of Insurgence USA which, really, is just a

17     vehicle for the transmission of information is a perfectly

18     proper, perfectly legal exercise of his right to be

19     gainfully employed.

20            The government says, Well, you should look for

21     employment; that's fine, but he has employment.  He has

22     employment with Insurgence USA.  Insurgence USA is not

23     charged as a defendant in this case.  Mr. Sullivan is not

24     charged as being, in any way, in a conspiracy with

25     Insurgence USA, of being a participant, as some sort of

1    ancillary robot of Insurgence USA; there is no connection

2    there whatsoever.

3         He was using his validly documented work with

4    Insurgence USA to promote his activities.  This has nothing

5    to do with the crimes that occurred inside -- if they were

6    crimes -- inside the United States Capitol; so, for those

7    reasons, we'd say there is no connection.  And just to say,

8    well, because, Mr. Sullivan, you're charged with a crime,

9    we're going to deprive you of your gainful employment that

10   you have created, that you have managed, that you are the

11   sole proprietor of -- that there is no connection whatsoever

12   between that company and the crimes which you are charged --

13   is completely beyond the scope of what the statute that

14   we're working under requires.

15        The social media limitations are also incredibly

16   oppressive, incredibly overbroad, and serve no purpose other

17   than to, basically, oppress Mr. Sullivan.

18        We laid it out in detail in our detention

19   memorandum.  Social media is how people -- particularly in

20   Mr. Sullivan's age group -- communicate with each other.

21        So if the government is saying, Well, we want to

22   limit you.  We want to separate you out from society;

23   separate you out from your friends; separate you out from

24   your family; separate you out from your business

25   association -- associates; separate you out from your

1      ability to market your legitimate business by taking you

2      down on social media; it's incredibly oppressive.  And to

3      say that he can't use Twitter, that he can't use Facebook --

4      these are outrageous requirements.

5             And the government says, well, as long as it

6      doesn't prohibit [sic] crimes -- excuse me -- that he's

7      prohibited from inciting crimes.  He is not going to be

8      inciting crimes on Twitter or Facebook; and if he is, the

9      government has a remedy.  But there is nothing to suggest

10     that he has ever incited any criminal activity on Twitter or

11     Facebook or any other social media platform.

12            His only use of these platforms is a completely

13     legitimate use, which is typical of millions and millions of

14     Americans.  That's how people, again, most -- I would say

15     predominantly Mr. Sullivan's generation, his age group --

16     that's how they communicate.  That's how he gets his news;

17     that's how he gets his weather; that's how he gets his

18     information.  That's how he keeps in touch with friends and

19     family, especially during the pandemic when people are not

20     out and about and commingling with each other.

21            They use these platforms to meet with each other,

22     to talk with each other, to exchange ideas.  Mr. Sullivan is

23     very much involved in the exchanging of ideas amongst his

24     peers; this is how he does it.

25            We cited *Packingham versus United States* which is

1    the Supreme Court decision in our pleadings today, where

2    *Packingham* very clearly -- the Supreme Court made very clear

3    that a fundamental principle is that all persons have access

4    to places where they can speak and listen and then, after

5    reflection, speak and listen once more.

6         Today, one of the most important places to

7    exchange views is cyberspace, particularly social media.

8    And that opinion was written by Judge Kennedy prior to the

9    pandemic; it was written in 2017.  And that opinion hits it

10   right on the head with respect to this case; that this is

11   how this young man, who has not been convicted of any

12   criminal offense, is able to communicate and able to get

13   information legally and disseminate information legally.

14        And to now say that, well, you are restricted

15   because the government has charged you in a case -- that we

16   are now going to restrict you from using these platforms is

17   a complete -- I would submit to the Court, respectfully -- a

18   complete violation of his First Amendment right to freedom

19   of speech; and it's oppressive.  And, really, it serves no

20   purpose.  It serves absolutely no purpose other than to cut

21   this young man off from legitimate access to social media

22   platforms.

23        I also -- I think it's incredible that the

24   government is asking for a mental health evaluation and that

25   Mr. Sullivan should then pay for any type of subsequent

1   treatment.  What is the basis for that?  There is absolutely

2   no basis; this man is not mentally ill.  The charges with

3   which he is charged have nothing to do with his mental

4   acuity.  This is not a situation where there is some concern

5   about whether the person understands the nature of the

6   proceedings.

7           He has a complete and very knowledgeable

8   understanding of the nature of the proceedings, of the

9   nature of his conduct, of his surroundings.  He is perfectly

10  able to communicate with me as his counsel, to assist in the

11  formulation of his defense.  And to come in with no basis --

12  no medical records, no medical history, no reports from

13  physicians saying, oh, Mr. Sullivan, you're charged with a

14  criminal offense so we want you to undergo a mental health

15  evaluation is a complete intrusion on his rights to privacy.

16  It's completely inappropriate; and we would strenuously

17  object to that.

18          I want to get to the issue of the searching of his

19  car and his home.  We obviously completely and strenuously

20  object to that.

21          Mr. Sullivan -- because he has been charged with a

22  criminal offense -- doesn't give up his Fourth Amendment

23  right to privacy.  So the government is coming in and

24  saying, well, if we believe -- based on what?  What is the

25  basis for their belief?  Is this just some fanciful belief?

1    Something -- some idea that just floated into their heads?

2    If we believe that Mr. Sullivan, without any foundation --

3    believe that he may have been involved in some criminal

4    activity, we reserve the right to go search his car and

5    search his house.  That, I submit to the Court, is

6    incredible and intrusive violation and an intrusion on

7    Mr. Sullivan's Fourth Amendment constitutional rights.

8           If the government believes that there is some

9    proceeds of a crime or fruits of a crime in either

10   Mr. Sullivan's car or his house, the United States then can

11   go to a federal magistrate, in a completely separate matter

12   from this, and try to obtain a warrant based upon probable

13   cause.  But, certainly, what they can't do is say:  Well,

14   we're going to bypass the ordinary regulations; we're going

15   to bypass the way we ordinarily do things; we're going to

16   bypass the Fourth Amendment, and just go and search his car

17   and his home -- absolutely, undeniably a violation of Fourth

18   Amendment rights.  And Mr. Sullivan is not waiving -- as any

19   part of these proceedings, he is not waiving First Amendment

20   rights; he is not waiving Fourth Amendment rights; he is not

21   waiving any constitutional rights.

22          The government says:  Well, we want to impose

23   restrictions that Mr. Sullivan avoid all contact with

24   victims, witnesses, or codefendants.  Well -- so what the

25   government is then saying is that:  Well, Mr. Sullivan,

1    because you have been charged in this offense, we're saying

2    you should not be allowed to participate in building a

3    defense; and, if you do, you are violating your conditions

4    of pretrial release.  Again, that involves a restriction on

5    his Sixth Amendment right to the effective assistance of

6    counsel.  Now we have got three constitutional provisions

7    that the government is seeking to step on, to trounce,

8    because Mr. Sullivan has been charged as -- in a crime.

9         Number one, with respect to codefendants, neither

10   Mr. Sullivan nor I can go to the codefendants because they

11   have counsel.  So the only thing we can do is ask counsel if

12   we can speak to the particular person.  And, certainly,

13   we'll abide by our professional rules and responsibilities

14   in regard to contacting codefendants.

15        But to say that Mr. Sullivan cannot interact with

16   victims or witnesses is just prohibitive; they can't do

17   that.  You can't say that you can't go with your lawyer, for

18   instance, and go and interview a witness, or go and

19   interview a victim.  And what constitutes -- under what

20   umbrella are these people being put under that they are

21   victims or witnesses?

22        There are hundreds of people involved.  There are

23   thousands of people involved.  It would undertake a massive

24   investigation to try to learn who witnesses may be, who

25   victims may be; and we are certainly going to try to contact

1    them and speak with them.  But to say that Mr. Sullivan

2    can't be involved in that is clearly an intrusion.

3              I can't count the number of cases that I have been

4    involved with over the years where I have interviewed

5    victims or witnesses to crimes; and I have had my client --

6    if that person was not incarcerated -- with me in the vast

7    majority of those times.  I want my client to hear what that

8    person has to say personally.  I don't want to just take

9    notes and bring them back to my client.

10             I want my client to understand what this person

11   has to say about their knowledge of the event or my client's

12   not being a participant in the event; and that information

13   is essential because my client has to make decisions about

14   how to proceed in building his defense.  So, again, we have

15   got First Amendment, Fourth Amendment, and now a Sixth

16   Amendment violation.

17             We have no objection to his reporting to his

18   supervision officer.  Mr. Sullivan has already turned in his

19   firearms; and he is not going to acquire any additional

20   firearms.

21             The government says, well, no use of narcotics.

22   Well, he doesn't use narcotics.  And if it's illegal, it's

23   illegal; and he is not going to acquire or obtain or use

24   anything that's illegal.  He may be taking -- I am not quite

25   sure if he takes prescription medication; but, obviously,

1       there is no prohibition against prescription medication.

2               He's already surrendered his passport.

3               I do -- I want to get to the ankle monitoring.

4               Well, let me go back to the computer monitoring

5       and the program.  Every case that I am aware of with respect

6       to the computer monitoring program involves sex offenses

7       because that's the vehicle by which, typically, the people

8       who are charged with sex offenses gain access to the victims

9       of their alleged sex crimes.  This is not a sex crime case;

10      this has nothing to do with a sex crime case.

11              The monitoring -- the government hasn't laid out

12      any reason -- any specific articulable reason that would

13      justify entry into an internet monitoring program.  There is

14      nothing in this case -- and I know I have already said this,

15      but I will just repeat it -- to suggest that the use of his

16      computer, the use of the internet is what Mr. Sullivan

17      relied on for the activity that brings him before this

18      Court.

19              So I believe that I have covered most of the

20      arguments and most of the grounds and most of the conditions

21      that the government is asserting.  We would incorporate the

22      memorandum that we filed yesterday into our arguments.  And

23      we certainly would be amenable to answering any questions

24      the Court may have.

25              One final thing.  There may be an issue as to

1    residency, where Mr. -- not "residency" with respect to the

2    state of Utah, but the particular place of residency with

3    respect to Mr. Sullivan.  But we'd just ask the Court for a

4    break so I can confirm some information related to that.

5              THE COURT:  I'm sorry.

6              MS. HOLMAN:  Your Honor, this is Ms. Holman.

7              THE COURT:  You wanted a breakout room?

8              Mr. Kiersh, I am not sure why I didn't --

9    something on my computer buzzed.  I didn't hear the last

10   thing you said.

11             MR. KIERSH:  I said that there may be an issue

12   with respect to Mr. Sullivan's place of residence.  He will

13   remain in Utah, but I just need a breakout for 30 seconds

14   just to confirm some information.

15             THE COURT:  I see.  With Mr. Sullivan?

16             MR. KIERSH:  Yes, and his father who is also on

17   the line.

18             THE COURT:  Okay.  And then, Ms. Holman, did you

19   have something that you wanted to ask or raise before I let

20   Mr. Kiersh confer?

21             MS. HOLMAN:  Yes, Your Honor.

22             Mr. Cahoon can confirm this.  But in reference to

23   the firearm, I don't believe it was surrendered to the

24   District of Utah.  I believe it was given to his father.

25   But Mr. Cahoon can confirm that.

```
 1                 MR. CAHOON:  Your Honor, this is Josh Cahoon.

 2            That was the information I was provided by the

 3   defendant.  He indicated he had sold the firearm to his

 4   father and had a bill of sale to prove this transaction

 5   occurred.

 6                 MR. KIERSH:  I can confirm that information, Your

 7   Honor.

 8                 THE COURT:  And does Mr. Sullivan reside with his

 9   father?

10                 MR. KIERSH:  No.  He does not presently reside

11   with his father; but he is going to have to change his

12   address at the end of this month.  What we are trying to

13   make a final determination is whether or not he can reside

14   with his parents who live about an hour away from Salt Lake

15   City.

16                 THE COURT:  Okay.  Ms. Kay, can you put Mr. Kiersh

17   and Mr. Sullivan in a breakout room so they can briefly

18   confer?

19                 THE DEPUTY:  Yes, Your Honor.  Just one moment.

20                 (Whereupon, Mr. Kiersh and the defendant confer.)

21                 THE DEPUTY:  I closed the room.  So Mr. Sull --

22   okay.  Mr. Sullivan and Mr. Kiersh are back.

23                 MR. KIERSH:  Thank you, Ms. Kay.

24                 THE COURT:  Thank you.

25                 Mr. Kiersh.
```

1      MR. KIERSH:  Yes, Your Honor.

2      Just a couple of things.

3      I may have not fully discussed the ankle

4  monitoring but, again, Mr. Sullivan has -- there is really

5  no issue of flight in this case.  I mean, no one is

6  suggesting that Mr. Sullivan is not going to appear at every

7  court appearance that he is required to appear before.

8      He has faithfully appeared in every Utah state

9  court proceeding.  He has faithfully appeared in every Utah

10  federal court proceeding; and he has faithfully and timely

11  appeared in every court proceeding in the United States

12  District Court for the District of Columbia before Your

13  Honor.

14      He doesn't have a passport.  He doesn't have

15  resources to go anywhere.  He certainly will abide by the

16  condition that if he is going to travel out of state he will

17  first seek prior approval.  But there is no reason in the

18  world to monitor him, we would submit, on the ankle bracelet

19  because there is nothing to suggest that he is not in full

20  compliance with his responsibilities with respect to

21  appearing in Court; there is no risk of flight whatsoever.

22  So we would submit and incorporate by reference our

23  arguments on the ankle monitoring.

24      With respect to Mr. Sullivan's housing, he is

25  going to be -- have to leave his premises that he currently

1    resides in at the end of February.  He is seeking to find

2    another residence in the Salt Lake City area to move into.

3    But as a backup, if he can't secure an apartment in Salt

4    Lake City, he will reside with his parents.  And I believe

5    that Jack Sullivan, his father, can make any representations

6    or answer any questions the Court has regarding his

7    permission to allow his son to reside in his house.  And

8    that if Mr. Sullivan is able -- Mr. John Sullivan is able to

9    acquire a new residence, we will certainly notify pretrial

10   of the address and any other means of communication with

11   respect to the new residence.

12              THE COURT:  Thank you.

13              Ms. Wong, could you -- with respect -- first, with

14   respect to Insurgence USA, what is the government's proffer

15   for why future work of any kind with Insurgence USA would

16   pose a danger to the community?

17              MS. WONG:  Sure, Your Honor.

18              And I apologize if you had expected this earlier.

19   I thought I was just summarizing the request of conditions;

20   but I am prepared to address at length and proffer why the

21   government is seeking these restrictions.

22              THE COURT:  Okay.

23              MS. WONG:  If I could just briefly mention two of

24   the things that Mr. Kiersh said because -- I think he's just

25   misreading what the conditions actually say.

1            One is -- on the mental health evaluation, I

2      believe that just says:  Undergo a mental health evaluation

3      and complete any recommended treatment as directed by your

4      supervision officer.  That's no different from the standard

5      condition we see all the time where you undergo mental

6      health treatment as needed; so I think that's at the

7      discretion of the supervision officer if that's required or

8      not.

9            As to the search, Mr. Kiersh asked what that would

10     be based on.  The specific language in the condition is:

11     Submit person, residence, office, or vehicle to a search

12     conducted by the supervision officer at a reasonable time,

13     in a reasonable manner, based upon reasonable suspicion of

14     contraband or evidence of a violation of a condition of

15     release.  So that is the standard:  Reasonable suspicion of

16     contraband or evidence of a violation.  I just wanted to

17     address those two briefly.

18            THE COURT:  Thank you, Ms. Wong.

19            Why don't you -- instead of -- if you could begin

20     with Insurgence USA, and then you can address any others.

21     I did initially want you to just list them because I wanted

22     to make sure we were all working from the same page.  But

23     certainly there has been an extensive and clear objection

24     from the defense.  So if you could justify any of those

25     release conditions --

 1              MS. WONG:  Certainly, Your Honor.

 2              Now, the government would note that these are

 3     not conditions -- the Insurgence USA condition is not a

 4     condition we would take lightly.

 5              But the reason the magistrate imposed these

 6     restrictions was for a reason; and that's because Insurgence

 7     USA, which is Mr. Sullivan's own LLC, headquartered in his

 8     own address, is the vehicle through which he is engaged in

 9     the underlying activities.

10              The representation that there is quote-unquote no

11     connection between the activity with which he has been

12     charged, both in Utah and in Washington, D.C., is unfounded,

13     Your Honor.

14              Insurgence USA is absolutely the instrumentality

15     through which Mr. Sullivan committed the relevant act.

16              Now, the defendant has now -- I would, first of

17     all, note that the Insurgence USA restriction was consented

18     to as appropriate by Mr. Sullivan's own counsel in Utah.

19     And the requirement that he get new employment reflects, as

20     the defense counsel stated, he was willing to do as believed

21     was appropriate.  Nevertheless, that is water under the

22     bridge.

23              I would note here the defendant has been

24     criminally charged twice in two pending cases with criminal

25     rioting activity that he would have not been on the scene

 1    for but for Insurgence USA.

 2            THE COURT:  So let me just interject here

 3    because I find -- I am going to go back and look at it

 4    before I make any decisions because I may be wrong.

 5            I would like you to be clear in distinguishing

 6    between whether Insurgence USA is recommending that people

 7    attend protests and then some sort of violence or possession

 8    of weapons -- or whatever illegally occurs at the protest,

 9    or whether Insurgence USA is specifically asking people to

10    do something illegal, because there is a distinction.

11            MS. WONG:  Yes, Your Honor.

12            I think I can parse this out in the following way:

13    Sometimes what Insurgence does is directly organize the

14    events which have been violent.  So one example is the Utah

15    protest in Provo which Insurgence and Mr. Sullivan organized

16    and promoted where a civilian was shot, and where he has

17    been charged with felony rioting; that's the criminal

18    mischief.

19            Sometimes Insurgence is Mr. Sullivan's reason for

20    being there and for his criminal participation in the riots;

21    that was the case on January 6th.  Insurgence USA did not

22    organize that demonstration; but he was there on behalf of

23    Insurgence USA, on behalf of the mission -- of what he deem

24    s is the mission of his group.

25            So he has stated that he has a need to document

1    these riots as part of what is Insurgence USA's mission.  In

2    fact, he claims to seriously disagree with the ideology of

3    some of these rioters.  But he justifies his own statements

4    on scene to law enforcement agents to statements including

5    having a knife; that we should burn it down; that we should

6    haul that MF'er [sic] out -- referring to an officer.

7         He justified his rhetoric while illegally inside

8    the Capitol on grounds that he was part of this undercover

9    work, or this is how he -- this is how he ensures that he

10   gets the coverage he needs and that he is not suffering

11   repercussions for that; it is how he quote-unquote needs to

12   relate to the people that he believes he's depicting.

13        Third, Your Honor, Insurgence positions itself as

14   a, sort of, expert resource for rioters.  Now, Mr. Kiersh --

15   this does bleed into the social media because I would say

16   the defendant has many social media accounts; some of which

17   are under the Insurgence handles, but that he retweets under

18   other handles; or that -- and they are all sort of -- they

19   all, kind of, put out the same content and retweet each

20   other sometimes.  But obviously, even on the defendant's

21   personal channels, he touts himself as the founder of

22   Insurgence USA.  He has videos on his personal YouTube that

23   are called:  Insurgence USA firearms training.  So they do

24   all bleed together.

25        But it's remarkable Mr. Kiersh noted that his

1    social media to be -- must be typical of what millions of

2    Americans his age engage in.  The government would submit

3    there is nothing typical about proffering postings, YouTube

4    postings, with tutorials on how to make a Molotov cocktail;

5    that is the defendant's own account; that is his own content

6    that he posts.

7         There is nothing typical about crowdsourcing

8    funding for tactical gear to arm rioters to protect them

9    against military officers that are depicted on Facebook in a

10   photograph.  There is nothing typical about this kind of

11   activity.

12        Your Honor, the defendant has a video that he

13   posted -- one of many -- where he posts a quote-unquote --

14   this is from December 2020:  A full guide on how to keep

15   yourself safe during protests and direct action.  This is

16   part and parcel of what I call the Insurgence USA mission of

17   serving as an expert resource for rioters.  On it, he

18   provides instructions to viewers on what clothing and type

19   of gear to bring to protests, to discuss the importance of

20   concealing logos on clothing and bags and tattoos to avoid

21   being identified.  He shows how you need a handgun -- he has

22   a 9mm handgun, a rifle; and he says:  If you need a less

23   lethal option, you choose a black retractable tactical

24   knife.

25        He encourages defendants -- he encourages viewers

1    to bring those items -- quote-unquote, again, this is how to

2    keep yourself safe during protests in direct actions.  He

3    notes in that video, when speaking about his 9mm handgun,

4    when speaking about what happened today in Washington --

5    this is in December 2020 -- I almost had to shoot an MF'er

6    and continued to say that:  If someone punched him or

7    sprayed him with pepper spray he would put a bullet in their

8    eye.  He refers to that rifle as a chud killer.  My

9    understanding is "chud" is often used by persons as a

10   derogatory term for Trump supporters.

11          Beyond that, Your Honor -- so Insurgence's entire

12   mission, as the defendant has styled it as alternately

13   calling it a journalist organization or an activist group.

14   But under the guise of journalism or activism he has engaged

15   in and incited violent activity, including the kind of

16   destructive activity we saw on January 6th.

17          He has used Insurgence's purported mission not

18   just for financial incentives.  In his videos he's widely

19   and frequently heard saying that -- calling for donations to

20   help me keep making more videos like this to help us fight

21   in the revolution, and how he presumably funds his trips,

22   which are frequent, to different protests -- just in the

23   last six months -- across the country; not just protest s

24   but, of course, violent riots.  Because he claims to be

25   there to live stream these events -- in his view, his job,

1   his work, his Insurgence mission is to put his body on the

2   line to bring people the best documentation of history; that

3   is what the Insurgence USA mission is in the defendant's own

4   words and according to his own public statements.

5          So, Your Honor, it was appropriate for the

6   District of Utah to hold that employment in Insurgence is

7   not authorized for this reason.  Insurgence is absolutely

8   the vehicle through which he both participated -- not just

9   promoted and organized to protest in Utah, but the reason he

10  was here in Washington, D.C., and the reason we know that

11  this kind of activity will continue to occur, and it's the

12  reason he excuses his own conduct on January 6th; his own

13  incitement and instigating statements that he is on videos

14  stating.  There is a direct message between Insurgence USA

15  and what happened both in this case and his serially similar

16  case in Utah.

17         Now, the government is not aware of this being any

18  kind of formal employment arrangement.  As we noted, this is

19  his own group.  There is no known group rosters or known

20  members.  So the government's submission is that with clear

21  language we can maintain that reasonable restriction that

22  was imposed by the magistrate judge in Utah that -- but with

23  more explicit spelling out of the kinds of provisions or

24  conditions that led in part to the defendant's violation

25  here.

1              Now, Your Honor, I can go into social media; but

2      do you have any other questions about Insurgence?

3              THE COURT:  Yes.  Do you have any information

4      suggesting that Insurgence USA would typically encourage

5      people to go to the Capitol on January 6?

6              MS. WONG:  Your Honor, the -- so we're hamstrung

7      in that the defendant has actually had almost all of his

8      Twitter and Facebook accounts suspended presumably because

9      of violations of the terms of service.  So I do have some

10     screenshots; I do not have anything from that time.

11             What I do have, Your Honor, is late December 2020

12     the defendant encouraged rioting; he said:  Riots are meant

13     to bring change to purge the world with fire.

14             On December 27th he stated that an armed

15     revolution is the only way to bring about change

16     effectively.  He has a picture of him at some other protest

17     and says:  I can tell you the dynamics completely shift when

18     shots will be fired back.  And this is a picture from the

19     Utah state capital.

20             So, Your Honor, the defendant has spoken freely

21     about how he organized on social media to infiltrate, in his

22     view, the organizers of the riots on January 6th.  He said

23     that in an interview with law enforcement agents, that he --

24     that is how he learned about protests; that he goes on

25     various social media platforms including -- I think he just

1    gave an interview to *The New Yorker* where he describes

2    joining activist group chats on Signal and Telegram to

3    collaborate with the community to stay abreast of where the

4    next big riot is likely to break out.  So he certainly warns

5    about it.  He has spoken openly, for instance, on the

6    Infowars interview that Your Honor is familiar with, about

7    how he had been hearing about it, how he knew to be in

8    Washington, D.C., because of social media activity.

9         This defendant has certainly also used his own

10   social media platform to post his footage, including the

11   images and the footage of himself engaging in the illegal

12   activity on January 6th.

13        As Your Honor notes, the government would submit

14   that his own footage does document his actions on

15   January 6th:  His illegal entry, his obstruction of the

16   official proceedings, and the civil disorder that he has

17   been charged with.  So that is all broadcast widely on his

18   social media channel.

19        As I noted, again, one of the challenges here is

20   that the defendant is a very prolific user on social media.

21   He has many, many accounts on each individual platform.  He

22   does widely use a large number of them and they retweet each

23   other.  A Facebook post will push out the same thing that's

24   on his Twitter.  It's the Insurgence -- there is an

25   Insurgence USA Facebook, as well as an Insurgence USA

1    Twitter.  But the content -- there is an Insurgence USA

2    YouTube.  The content seems to overlap extensively with the

3    same accounts that he has under different handles that may

4    not include the word "Insurgence."  But, yes, those -- as I

5    have noted, Your Honor, those -- the January 6th footage is

6    currently still available on YouTube which is one of the

7    accounts of his that has not been taken down as far as I

8    know.

9           Your Honor, if I can say just a little bit more

10   about the defendant's use of social media.  As I have noted,

11   he does promote protests and violence and armed

12   confrontations through social media.  He does use social

13   media to organize and set up these demonstrations.  He

14   learns of them, scouts them out through his social media.

15   He goes there funded in part by his social media channels

16   for outreach to get live footage -- live streamed footage

17   and YouTube footage so that he can put that out through

18   those channels; and he has absolutely engaged and promoted

19   himself in illegal activity encouraging violence.  So I

20   would note the December 29th video tutorial on Molotov

21   cocktails.  I would note the December 2020 guide

22   involving -- you know, urging protesters on how to disguise,

23   avoid identification, and bring weapons to any protests

24   including to use if you are pepper sprayed.

25           And the government has information about events in

1    L.A. involving the vandalism of a federal building in

2    September 2020 where a walk-in complainant to the FBI in

3    Salt Lake City provided Discord chats from Mr. Sullivan from

4    days before.  Mr. Sullivan was, according to Twitter, in Los

5    Angeles at the time and there was damage to a federal

6    building and vandalism causing property damage to the

7    structure, as well as some spray painting of ACAB and FTP --

8    which I understand stands for:  All Cops Are Bastards, and

9    Fuck the Police.  When guards gave chase, the suspects fled

10   to an awaiting vehicle.

11         What the walk-in complainant said is that they had

12   participated in a chat with Mr. Sullivan who was identified

13   as John Sullivan -- Activist John, Salt Lake City, Utah; and

14   that screen-shotted chat provided -- discussed associates

15   being decoys at the sheriff's department in West Los

16   Angeles; identified that federal building; gave parking and

17   paint smearing instructions; and provided a map with an X

18   marked on that federal building.  So these were Discord

19   communications on one of those platforms in September 2020.

20         The government would also note that the defendant

21   has -- and I mentioned this last week -- in August posted

22   videos of himself on YouTube in Washington, D.C., at a

23   microphone where he is inciting the crowd stating:  We about

24   to burn the shit down.  We got to rip Trump out of office.

25   And saying:  Pull him out of that shit.  We aren't waiting

1  til the next election.  We about to go get that MF'er.

2  Leading the crowd in a chant that:  It's time for a

3  revolution.

4        Your Honor, in this case, the defendant's social

5  media presence is not -- it does not read like a typical

6  20-something-year-old social media person.  It's not about

7  the weather; it's not about communicating with friends.

8        It is hundreds of videos like this, Your Honor.

9  It includes -- even where not celebrating outright illegal

10  activities, certainly celebrating and encouraging violence.

11  And there are legions of examples.  Just two months ago, one

12  of the videos on YouTube says -- it's titled:  What a

13  savage, running up on the cops like that with an AK-47.

14  There is a video.  Another one from two months ago:  The

15  black bloc in paris has a projectile launcher, emoji.

16  Anyone have a link?  Take my money.

17        Another one from two months ago:  Outstanding job

18  protesters in Paris, keep making them notice and burn it

19  all.  From December 31st, his tweet:  I am already ready to

20  go Nazi hunting in 2021; are you?

21        Your Honor, this is a situation where it is clear

22  that the lion's share -- if not the entirety -- of what the

23  defendant does on his very active social media channels is

24  inextricably tied to Insurgence USA, and what he does

25  through Insurgence USA is inextricably tied to exactly the

1      kind of activity that is why he stands here today.

2            Now, Mr. Kiersh noted that the defendant has been

3      absolutely compliant.  The government will just note that

4      the reason we were convened last week was because the

5      defendant had been documented with multiple violations of

6      his release conditions.  This is not an example of a

7      defendant who has been absolutely compliant to date.

8            The government does have a concern that with

9      unfettered access to communicate with confederates and

10     continues to incite violence and use armed conflict and

11     illegal activity, Your Honor, that that would not be an

12     acceptable risk here.

13           Given what the defendant has engaged in in his two

14     pending cases, the government thinks that it would be a

15     reasonable restriction here not to, again, espouse the -- I

16     believe there were 13 platforms that were specified in the

17     arresting jurisdiction but to limit it to the two in which

18     we know are probably the most widely available, Facebook and

19     Twitter, where he does have multiple handles, as I noted,

20     where many of those tweets and posts and crowdsourcing, or

21     his -- all of those that I have mentioned do arise on

22     Twitter and Facebook.

23           So as one option to more carefully circumscribe

24     the number of platforms, the government submits that that is

25     a more reasonable restriction and certainly would allow

 1    him -- would not prohibit him from seeking out employment,

 2    connect with family or be informed on current events.

 3              The government would also note this is not an

 4    internet ban.  He is allowed to access the internet under

 5    appropriate supervision.  What we are talking about here is

 6    social media platforms.  And what we are talking about among

 7    that universe is really just two social media platforms; two

 8    in which he has spoken openly about being blocked; using

 9    Lively [sic], and having to use a VPN to see if he can

10    create new accounts to get into; he's publicly spoken about

11    that.  The two of which he has, presumably, one of his

12    largest followings given his widespread use of this

13    platform.

14              Does Your Honor have any questions?

15              THE COURT:  No.  Not about social media or

16    Insurgence.

17              Could you speak to GPS, why an ankle bracelet is

18    necessary, given Mr. Sullivan's appearance of -- appearance

19    in court as required in the other jurisdictions, as his

20    counsel represented; and he certainly has appeared for

21    numerous hearings in the District.

22              MS. WONG:  Yes, Your Honor.

23              The government submits that GPS location

24    monitoring is appropriate because this is a defendant who we

25    know has traveled prolifically, just in the last six months,

1    precisely to chase these riots and this type of riot

2    activity.  As law enforcement is aware, he has traveled and

3    crisscrossed the country to violent riots in Portland, Los

4    Angeles -- I just mentioned the Discord events; in

5    Washington, D.C., multiple times; Seattle; Richmond; Utah.

6            Again, this is an organization that he created in

7    mid-2020; this is all really in the last six months.  The

8    defendant is a prolific traveler precisely to attend this

9    kind of gathering.

10           THE COURT:  Thank you.

11           Did you want to address any of the other

12   objections the defense made, such as contact with witnesses

13   and victims, being in violation of rights under the Sixth

14   Amendment or the search of his residence?

15           I guess you did briefly touch on the search.

16           MS. WONG:  Yes, Your Honor.

17           As to the search, my answer was just that that

18   does incorporate the reasonable suspicion standard and helps

19   effectuate the conditions of release as this Court said.

20           As to the language again about -- as I mentioned,

21   the condition is:  Avoid all conflict with named persons --

22   so I don't believe he has any codefendants.  I don't believe

23   there are any named victims or witnesses in this case.  So I

24   was just reading what is typically used as form conditions;

25   but it does not appear that there were any such individuals

1     that were named.

2              And if I can just say one final thing, Your Honor.

3     As to the First Amendment issues that have been raised,

4     *Packingham* involved a question about the level of scrutiny

5     that applies with respect to a law and whether or not that

6     law as a whole would apply when applied to an entire state,

7     an entire category of felons, including individuals that had

8     no longer any contact with the criminal justice system; that

9     certainly left open the possibility and, indeed, the

10    likelihood that as applied in an individual case, as all

11    restrictions pending trial, must be -- can be justified by

12    an individual.

13             Here it's generally the case that an internet

14    ban -- and this is not an internet ban yet; but, certainly,

15    you do see a greater prevalence of internet-type

16    restrictions in cases that involve sex offenders.

17             The government would note that this is not a

18    typical case and this is not a typical defendant.  Here it

19    is clear that the activity he's engaged in he's engaging in

20    because and for his social media channels and his social

21    media presence.

22             And here, you know, if the question is whether as

23    to social media an individual is likely to, sort of,

24    encounter a similar type of activity or address similar

25    types -- engage in similarly concerning acts, the

1    indications are legion, again, just from a cursory look at

2    the defendant's social media history.

3         The question is whether the defendant has used

4    social media to initiate and facilitate the defense in, for

5    instance, a child pornography context.  Here, the defendant

6    has certainly used social media with his platforms, his

7    channels.  The very footage he's creating is in order to be

8    distributed to those channels.  He's organizing the

9    confederates on those channels.  He's providing instructions

10   about how to serve as decoys from vandalism at the federal

11   buildings.  Certainly social media platforms have proven to

12   be a basis for him to initiate and facilitate certain

13   offenses.

14        The government would also note obviously -- again,

15   none of these cases are precisely on point but, also, the

16   restrictions we are talking about here are narrower and more

17   narrowly tailored to the individual; that there are cases --

18   I would just cite *United States vs Love*, 593 F.3d 1, a D.C.

19   Circuit opinion from 2010, upholding, again, far broader but

20   an internet prohibition for a defendant.  And I think some

21   of the factors they consider about this, whether or not --

22   even assuming and recognizing that there is a deprivation of

23   liberty -- whether or not that slightly greater deprivation

24   of liberty is reasonably necessary to deter illegal conduct

25   and protect the public.  In this case, the government would

1    submit that that is readily satisfied based on the specific

2    facts of this individual and his specific history of

3    engagement in social media.

4              THE COURT:  What was the cite for that case you

5    just mentioned, Ms. Wong?

6              MS. WONG:  593 F.3d 1.  And there is a related

7    opinion, Your Honor, called United States versus Legg,

8    L-E-G-G, 713 F.3d 1129, another D.C. Circuit opinion.

9              But, again, just noting these are articulating the

10   general principles.  They did uphold prohibitions in

11   slightly different contexts but extrapolating this principle

12   to the case at hand.

13             The government does think that the requested --

14   more narrowly-tailored prohibitions being requested are

15   certainly justified as an arguably greater deprivation on

16   liberty than might happen in the ordinary course.

17             THE COURT:  Thank you, Ms. Wong.

18             And has -- is it correct to assume -- because what

19   is being asked for here -- that Utah -- the state court

20   where the other charge is pending -- has not imposed any

21   restrictions based on the alleged violent riot -- rioting

22   that occurred there?

23             MS. WONG:  Your Honor, I am not aware of that.

24             I did know that the AUSA in Utah was about to

25   speak with the assigned local prosecutor to make them aware

1      of this arrest.  I don't -- I am not privy to those

2      conversations.

3                  THE COURT:  Thank you.

4                  Mr. Kiersh, did you want to say anything further

5      in rebuttal?

6                  MR. KIERSH:  Just a little bit of rebuttal to the

7      representations of Ms. Wong.

8                  When I spoke about Mr. Sullivan's perfect

9      compliance, what I was talking about is his perfect

10     compliance with respect to appearing for each and every

11     court appearance.  I understand that we had an issue of

12     violations that the Court ruled upon previously.

13                 But with respect to the limited issue of his

14     complete adherence to his requirements to appear faithfully

15     at every court appearance, there is no question that he has

16     fulfilled those responsibilities.

17                 I also want to talk a little bit about weapons.

18                 As far as I know and as far as the discovery that

19     I have received so far, there is no allegation whatsoever

20     that Mr. Sullivan was in possession of a gun or any type of

21     weapon regarding the events of January 6th at the United

22     States Capitol.  He is not charged with that.  There is

23     nothing in the complaint about that.  So I would ask the

24     Court, respectfully, to please take that into account in the

25     context of Ms. Wong's argument that he's using Insurgence to

1       promote violence.

2              He was clearly not armed -- at least as far as I

3       can see from the evidence that I have been shown so far; and

4       there is no suggestion that he -- before he entered the

5       Capitol or if he entered the Capitol that he was armed, or

6       anything like that.  So I would ask that you use that

7       information in evaluating the government's argument that he

8       was using Insurgence as some sort of vehicle to promote

9       violence.

10             What one person -- for instance, Ms. Wong --

11      characterizes a lot of his other uncharged conduct as being

12      involved in rioting, we characterize it as being involved in

13      constitutionally protected freedom of assembly.

14             There's no -- he has not been charged with any

15      riotous conduct in Oregon.  He has not been charged with any

16      criminal conduct in California.  There was no reason why he

17      was not permitted -- if he was even present at those events;

18      but he should not be punished because the government alleges

19      that he was at an event in Oregon that became disruptive or

20      he should be punished because he allegedly was at an event

21      in Los Angeles that became disruptive.

22             He had every right, if he was there, to be there.

23      And he had -- and this goes back to Ms. Wong's argument

24      regarding travel -- that he was a prolific traveler in her

25      argument regarding why he needs to be on GPS.  Again, if

1      Mr. Sullivan chose and had the means to travel to Oregon,

2      that's not a crime.  If he had the means and the desire to

3      travel to Los Angeles or any other state in the country,

4      that's not a crime.

5              Now that he has been charged, there is a condition

6      that we are not objecting to regarding that he seek

7      permission if he needs to travel out of state; that's fine.

8      That's standard, and we can abide by that.  But to say that

9      he needs to be on an ankle monitor because before this

10     happened he traveled a lot is completely inconsistent with

11     the statute that governs these proceedings.

12             He is somebody who -- again, if he desires to

13     travel -- and we don't really see any need for that other

14     than to meet with counsel to discuss his defense -- he'll go

15     to his probation officer and say:  I would like permission

16     to travel to wherever it is I am going.  If he violates

17     that, there will be a violation report issued.  So if that's

18     the only reason for the GPS, we submit the government hasn't

19     met its standard at all to impose this very, very

20     restrictive standard -- this restrictive condition that he

21     continue to be placed -- continue to have to be placed on

22     ankle monitoring.

23             I cannot account for why the lawyers who

24     represented Mr. Sullivan in Utah agreed to some of these

25     conditions.  I got into the case after the Utah

1    proceedings -- after the Utah court proceedings had

2    concluded.  But ever since I have been on the case, we have

3    been objecting to these restrictions.

4          And I haven't seen -- it hasn't been provided to

5    me yet -- the full length of Mr. Sullivan's Twitter and

6    Facebook accounts, but I would -- it seems to me that he is

7    using his Twitter and Facebook accounts not exclusively for

8    Insurgence; he is using it for what every other person

9    legitimately uses it for.

10          There is nothing -- he has not been charged with

11    committing any crime on Facebook or Twitter or any encrypted

12    site.  He is using those sites for legitimate purposes.

13          And, again, what the government -- what Ms. Wong

14    characterized as riotous behavior, that's a legal

15    definition; that's not been adjudicated.  If he's using

16    Facebook or Twitter to say:  Hey, let's meet at a certain

17    place, or there is going to be an assembly of people at a

18    certain place, let's get together and go -- there is nothing

19    illegal about that.

20          I would agree that Mr. Sullivan should be

21    prohibited from using social media to commit crimes;

22    certainly we are not going to object to that.  But because

23    there's been nothing -- there is no evidence that's been

24    presented to Your Honor to suggest that he used Insurgence

25    USA to get people to the United States Capitol on

1    January 6th to commit crime -- there is nothing that the

2    government has presented which would support that position.

3    And unless and until the government has evidence that

4    Mr. Sullivan used Insurgence USA to get people to

5    Washington, D.C., to charge the Capitol -- to illegally

6    enter the Capitol and commit the crimes that were committed

7    in the Capitol, I would submit to the Court that the

8    government has not, by any standard, satisfied its burden.

9             So for all of the reasons stated in my memorandum

10   and in my arguments today, we would ask the Court to not

11   impose the conditions that the government has suggested with

12   the exception of the few that we have agreed are acceptable

13   and appropriate.

14             THE COURT:   Thank you.

15             Ms. Wong, did you want to respond any further?

16             MS. WONG:   Yes, Your Honor.   Just briefly on a few

17   points.

18             First, with respect to there not being any

19   indication or inference of an indication of a weapon in the

20   complaint, that's not correct.   The defendant is, as

21   prescribed in the complaint on camera, at multiple points

22   within the Capitol, stating -- describing that he has a

23   knife on him.   It is true that he has not been charged with

24   a knife, but I would just note that for clarity of the

25   record.

1          Secondly, I would note this complaint is not the

2     only analysis here.  As Your Honor notes, the government

3     sought detention because they did believe that the defendant

4     was a danger to the community.  The question is whether

5     there are conditions which, in the government's view, should

6     include GPS monitoring that would help suffice to provide

7     that reasonable assurance that he will not pose that risk.

8          Finally, I would just note with respect to riots,

9     riotous, rioting being the legal definition -- that is the

10    defendant's own term; that is what the defendant himself has

11    celebrated.  When I speak of riots, that is not my gloss on

12    it; that is the defendant himself glorifying riots in his

13    tweets on December 26th.  Riots are meant to bring change

14    and purge the world with fire.

15         It's the defendant himself on his footage in the

16    Capitol on January 6th boasting to others that:  I have been

17    to too many riots; I have been in so many riots; I am ready,

18    bro'.  And then later telling another individual who is

19    talking about people getting arrested:  You will be fine;

20    that's why I'm a photographer.  It's only a little jail

21    time; I do this all the time.

22         That's why, at the end of the day, Your Honor, the

23    government would submit that it's a red herring whether or

24    not -- and it's difficult to prove here given the removal of

25    his accounts, whether or not he was encouraging people on

1    his specific accounts -- the other rioters to arrive on

2    January 6th.  We know that that's the whole reason he was

3    there on January 6; and we know that his justification for

4    the acts with which he has been charged -- that is his

5    justification for why he was saying:  Haul that MF'er out;

6    why he was in the Speaker's Lobby persuading those officers

7    to leave their posts at the very scene where a woman

8    fatefully lost her life.  So, Your Honor, the defendant was

9    there because of his activities with Insurgence USA.

10              Thank you.

11              THE COURT:  Thank you, Ms. Wong.

12              I am going to be mindful of the fact that we need

13    to conclude this by 5:15 -- by 6:15, which is still

14    55 minutes away but, also, respect that I don't want to

15    continue this yet again; I would like to get the conditions

16    out.  But I am going to take a brief recess to look over my

17    notes on the requested conditions, the areas of dispute.  I

18    will also take a quick look at the two cases that Ms. Wong

19    cited; and I will come back.

20              If you want to -- if anyone else -- if anyone

21    wants to take a break to stretch your legs, or whatever, I

22    think it will take me about -- it will take me at least

23    20 minutes; it may take me a little bit more.  So if you

24    want to turn your cameras off and come back on in the

25    vicinity of 5:45, and if I am not ready to rule I will let

1    you know then.

2          I am hoping that I will be able to rule on the

3    release conditions by that time.

4          THE DEPUTY:  Okay, Your Honor.

5          (Whereupon, a recess was taken, 5:22 to 5:52 p.m.)

6          THE DEPUTY:  Your Honor, we are back on the

7    record.

8          THE COURT:  Okay.  Thank you.

9          I just have a question for Ms. Wong and probably

10   Mr. Cahoon.  The United States is requesting the computer

11   and internet monitoring program.

12          In the original jurisdiction -- in the arrest

13   jurisdiction's release conditions there were tiers of

14   internet monitoring that we -- I believe this one was placed

15   in Appendix A.  Are you asking that I use a similar -- if I

16   approve internet monitoring, which I am inclined to do, are

17   you asking that I specify one of those tiers recognizing

18   that there will need to be some modifications to the extent

19   that the tiers would allow for bans on websites to be set at

20   pretrial's discretion?

21          MS. WONG:  Yes, Your Honor.  The government would

22   request the same Attachment A.

23          THE COURT:  Okay.

24          And then a question for pretrial services in Utah.

25          Mr. Cahoon, there's been some argument about a

 1    request that Mr. Sullivan submit himself or his vehicle or

 2    residence to search on suspicion of violations or

 3    contraband.  Does pretrial contend that it needs access to

 4    his residence -- something beyond the Appendix A to be able

 5    to determine if -- I guess to be able to monitor the

 6    devices?

 7              MR. CAHOON:  No, Your Honor.

 8              We can remotely monitor the devices from the

 9    software that we install on his -- excuse me -- from the

10    software that we install on media-approved devices.  That

11    other condition would come when we would be conducting

12    visits if we notice anything that would suggest that he has

13    other types of digital media or storage devices, or other

14    internet access capable devices that are not being monitored

15    that we are unaware of.

16              THE COURT:  Thank you.

17              Mr. Kiersh, I know the defense has objected to any

18    requirement that Mr. Sullivan submit to search.  Would there

19    also be an objection to a requirement that we allow pretrial

20    services to search if they have indication that he has a

21    device that is not authorized under the monitoring?

22              MR. KIERSH:  Yes, Your Honor.  We would object to

23    that for the reasons previously set forth.

24              THE COURT:  Thank you.

25              Okay.  Having reviewed the recommended conditions,

1    the information in the record, and the requests and

2    arguments from both the United States and the defense -- and

3    I thank counsel on both sides for your detailed presentation

4    of the legal issues as well as the factual proffers

5    presented here.

6             I have a high-level summary, first, and then will

7    go through it one by one.  At this time of the high-level

8    summary, I am going to partially grant the United States'

9    request for release conditions.

10            I am rejecting home detention and GPS monitoring

11   because I don't believe either has been demonstrated to be

12   necessary to protect the safety of the community or assure

13   Mr. Sullivan's appearance as required.

14            I am rejecting the recommended condition that

15   Mr. Sullivan avoid contact with named persons who are

16   victims, witnesses, or codefendants given that there appear

17   to be no such readily identifiable people in this case.

18            I am rejecting the request that he be evaluated

19   for mental health given that I see nothing in the record

20   that indicates that this case -- distinguishes this case

21   from other cases before the Court in which no such

22   evaluation has been required for people charged with similar

23   crimes.

24            I am rejecting the proposed condition that he

25   submit his person, vehicle, or residence to search upon

1   reasonable suspicion of contraband or violation of release

2   conditions.

3          And I am rejecting the broader prohibition of

4   Twitter and Facebook and encrypted social media platforms,

5   but I am accepting the alternative proposal to have more

6   targeted social media restrictions.

7          With that said, specifically, I've concluded that

8   the release conditions should be as follows:

9          Mr. Sullivan will be subject to courtesy

10  supervision by pretrial services in Utah -- the District of

11  Utah.

12         He will also comply with internet monitoring

13  programs, Attachment A, which I will clarify in the release

14  papers -- I will have to go through it line by line to make

15  sure there is nothing else -- there may be a few things that

16  are different; but I will note that to the extent that

17  Attachment A does give pretrial services the discretion to

18  add websites to what is prohibited and not hearing that

19  or -- given the First Amendment concerns that have been

20  raised here.  I don't want to delay it by trying to read out

21  line for line while I scratch out -- it will be clear with

22  the release order.

23         So he is to be subject to internet and computer

24  monitoring by pretrial services.

25         He is to maintain his employment -- jumping back

to the broader point.  I did not address the Insurgence USA.

I am granting the request that he be prohibited from working

for Insurgence USA.

So going back to the list of conditions, he is to

obtain or seek employment.  However, he is to no longer work

for Insurgence USA, which would include:  Promotions,

affiliations, marketing -- or promotions with Insurgence

USA, InsurgenceUSA.com, or other iterations of the entity.

Essentially, all activities regarding Insurgence USA are

prohibited except for paying taxes and maintaining existing

bank accounts.

I realize that is an objected to condition.  I

find the proffers made by the USA regarding specific

Insurgence USA promotion of making weapons, bringing weapons

to protests is sufficient; as well as the pending charges in

the state of Utah are sufficient to warrant such a

restriction in this case.  We'll note that it is unusual and

more restrictive than has been present in other

Capitol-related cases that I have seen or that have appeared

before me.

He is not to travel outside the state of Utah

without prior permission from pretrial services.  He is not

to travel outside the continental United States without

prior court approval.

He is to report on a regular basis to his

1    supervising officer with pretrial services in Utah as

2    directed by that pretrial services agency.

3            He is not to possess any firearms, ammunition, or

4    explosive devices.  He is to surrender any passports not

5    applied for or obtain new passports.

6            In terms of specific social media restrictions, he

7    is not -- I am not prohibiting Twitter and Facebook or

8    encrypted social media platforms.  I am prohibiting him

9    using any social media platforms to incite a riot or to

10   promote or advocate for violent protests, unlawful protests,

11   armed conflict, or violence.

12           He is to appear in court as required.  He is not

13   to commit any state or federal crimes.  And he is to verify

14   his residence and notify pretrial services in advance of any

15   proposed change of residence.

16           I realize I didn't accept all of the conditions

17   that the United States recommended.

18           But, Ms. Wong, are there any conditions that you

19   recommended that I just have not addressed at all?

20           MS. WONG:  Your Honor, did you address the

21   narcotics provision?

22           THE COURT:  I did not.

23           MS. WONG:  I believe that's the only one.

24           THE COURT:  Mr. Kiersh, my notes are not clear on

25   your position on narcotics.

1        I wrote down that you said he doesn't need them so

2    it's not an issue.  By saying "it's not an issue" do you

3    mean it's not an issue that warrants a condition or it's not

4    an issue that warrants an objection?

5        MR. KIERSH:  Well, I don't believe it's an issue

6    that warrants further discussion because Mr. Sullivan is not

7    a narcotics user, and it's not something that's ever going

8    to come into play in this case.  So if anybody is in

9    possession of an illegal substance they're going to be held

10   accountable.  There is no reason to suspect Mr. Sullivan is

11   going to be involved in that type of activity, so I don't

12   believe it's a necessary issue that needs a resolution by

13   the Court.

14       THE COURT:  Thank you.

15       Ms. Holman or Mr. Cahoon, is not using any

16   unlawful narcotics -- is that a standard condition when Utah

17   is doing courtesy supervision?

18       MR. CAHOON:  This is Josh Cahoon, Your Honor.

19       Not normally, unless there is a potential that the

20   defendant may or may not -- or may be trying to abuse drugs,

21   then we would request that condition as well as a drug

22   testing condition to supplement it.

23       THE COURT:  Thank you, Mr. Cahoon.

24       So I will not impose a prohibition on narcotics or

25   controlled substances recognizing, of course, that the

1    general prohibition against violating the law would apply.

2            Mr. Kiersh, are any of those conditions -- I

3    recognize, of course, you may appeal.  But are there any

4    conditions that you wanted me to further explain to

5    Mr. Sullivan or to you for that matter?

6            MR. KIERSH:  Thank you, Your Honor.

7            I believe that Mr. Sullivan and I have an

8    understanding.  I will speak with Mr. Sullivan later on.

9    We'll find out whether or not he does.

10           He understands the nature of the proceedings and

11   he understands the nature -- I am confident he understands

12   the nature of the Court's ruling.

13           My only question is whether or not Mr. Sullivan

14   and Mr. Cahoon should discuss between themselves how to

15   remove the ankle monitor and just the logistics of turning

16   it in.

17           THE COURT:  Mr. Cahoon.

18           MR. CAHOON:  Yes, Your Honor.

19           I will have him -- as soon as the hearing is

20   concluded, he can turn off the device; and I will pick it

21   up, and all associated equipment, from him tomorrow.

22           It is no longer a condition of release.  We don't

23   want it on him any longer than is reasonably needed.  So as

24   soon as the proceeding is over he can cut it off.  I will

25   terminate the condition of the GPS monitor and pick up all

1    equipment tomorrow.

2              MR. KIERSH:  Thank you.

3              THE COURT:  Thank you.

4              Does pretrial -- Ms. Holman, you may be preparing

5    the papers.  Does pretrial need any further clarification

6    from me on any of these, recognizing that you can also

7    follow up with my chambers as you're working on the draft

8    order?

9              MS. HOLMAN:  No, Your Honor.

10             You answered my only question.  I didn't know

11   if -- Your Honor has stated that she would be issuing an

12   order or do you want pretrial to fill out the order?

13             THE COURT:  If you could send us your draft as you

14   typically do, we will take care of any adjustments to that

15   Attachment A on internet monitoring, and -- that's my

16   intention.  If, after looking at this, you think the

17   other -- you think deviating from that would make sense, you

18   can follow up with my law clerk, and we can figure it out.

19             MS. HOLMAN:  Okay, Your Honor.

20             MS. WONG:  Does Your Honor need Attachment A?

21   Mr. Cahoon just emailed it to me a few days ago.

22             THE COURT:  I have it from the original hearing, I

23   believe.  Well, I have it from -- maybe if you can send it.

24             I have what was attached to the Utah court which I

25   was guessing was the same -- somehow it ended up before me;

1    but just to make sure I am working from the same document

2    and not something outdated, it would be helpful if you send

3    it to my chambers' account.

4            Thank you.

5            MR. KIERSH:  Just for my clarity, with respect to

6    Twitter and Facebook, Mr. Sullivan can use Twitter and

7    Facebook, he just can't use it to incite a riot or other

8    criminal endeavors; is that correct?

9            THE COURT:  Right.  He can't use it to incite a

10   riot, a violent protest, unlawful protest, armed conflict,

11   or violence.

12           MR. KIERSH:  Thank you.

13           MR. CAHOON:  Your Honor, this is Josh Cahoon.

14           I wanted to clarify one thing.

15           THE COURT:  Yes.

16           MR. CAHOON:  As far as the computer and internet

17   monitoring goes, it would be my understanding then that we

18   would open up all avenues of internet access for the

19   defendant as long as they are approved and monitored

20   devices; and we will be monitoring the internet activity and

21   other activity associated with those -- specifically for

22   those reasons you stated, for inciting a riot, violent armed

23   conflict -- of that nature, correct?

24           THE COURT:  Is that something you can do if it's

25   not in specific platforms?

1          MR. CAHOON:  That is something that we can do.

2     It's time consuming.  It's intensive supervision, Your

3     Honor, but it is something that we can do.

4          THE COURT:  So I was saying not doing that on

5     social media platforms.  Let me clarify.

6          Ms. Wong, I know you presented that as an

7     alternative.  I can't tell from my notes.  Was that specific

8     social media sites?  I mean, can we target that to -- was

9     that for Twitter and Facebook, or was it for some others as

10    well?

11         MS. WONG:  Our proposal was that this would be

12    across all platforms if we were just focused on that.

13         THE COURT:  Okay.  Thank you.

14         That's what I will do.

15         If that becomes unworkable, it probably will go to

16    Judge Sullivan as opposed to me.  If that becomes

17    unworkable, perhaps there can be a request to modify the

18    conditions to facilitate the monitoring.

19         MR. CAHOON:  Thank you, Your Honor.

20         We can flag specific key words that may help us so

21    that any time those key words are presented in any of the

22    data it would notify us to then investigate further, so we

23    can do that as well.

24         THE COURT:  Okay.  Thank you.

25         MR. KIERSH:  Your Honor, with respect to the

1    internet monitoring, Mr. Sullivan and I have privileged

2    communications over the internet via electronic now; and I

3    certainly don't want any communications -- Mr. Sullivan

4    certainly would object to any communications between himself

5    and me being read or in any way considered by anyone.  I

6    mean, it should just be between the two of us as part of our

7    confidential relationship.

8              THE COURT:  Mr. Cahoon, is there a way to exclude

9    certain email accounts from the search, the keyword search?

10             MR. CAHOON:  Not generally.

11             I will dig into it and see if there is a way so

12   that we can block -- so that we don't even see any of the

13   communication between defense counsel and his client.  If

14   those things do come up, it is our practice to not even read

15   them and to just dismiss them in their entirety so that we

16   do not disrupt that privilege that they have between one

17   another.

18             THE COURT:  Okay.

19             MR. KIERSH:  Thank you.

20             THE COURT:  Thank you.

21             Okay.  With that, Mr. Kiersh, can I have my

22   courtroom deputy swear Mr. Sullivan to his conditions to

23   make sure everything is on the up and up.

24             MR. KIERSH:  Yes, Your Honor.  Thank you.

25             THE COURT:  Okay.  Ms. Kay, would you please swear

1   Mr. Sullivan to his conditions.

2               THE DEPUTY:  Yes, Your Honor.

3               Mr. Sullivan, would you please raise your right

4   hand?

5               (Whereupon, the defendant was sworn to the

6   conditions of release.)

7               THE DEFENDANT:  I do.

8               THE DEPUTY:  Thank you.

9               THE COURT:  Thank you.

10              Mr. Sullivan, can you confirm for the record that

11  you have heard and understood the conditions that you just

12  agreed to follow?

13              THE DEFENDANT:  I do swear --

14              THE COURT:  I couldn't hear you.

15              THE DEFENDANT:  I do understand the conditions.

16              THE COURT:  Thank you.

17              Do the parties have a next court date before

18  Judge Sullivan already?  You do.

19              MS. WONG:  Yes, Your Honor.  This Thursday.

20              THE COURT:  Okay.  Is there anything else

21  regarding release conditions that we need to address before

22  we adjourn?

23              MS. WONG:  No, Your Honor.  Thank you.

24              MR. KIERSH:  Not on behalf of Mr. Sullivan.

25              Thank you.

1           THE COURT:  Okay.  Thank you.

2           And thank you, again, to pretrial for making

3    yourself available.  The Court will coordinate with pretrial

4    to get the release order; and we will provide a copy of that

5    to counsel.

6           That concludes this matter.

7           Mr. Sullivan is released under the conditions

8    stated on the record.

9           Well -- I am sorry.  I need to do a couple of

10   warnings.

11          Mr. Sullivan, I did release you under the

12   conditions of release.  The paperwork will say this as well,

13   but if you violate the release conditions, you could find

14   yourself facing revocation proceedings as you did when you

15   first appeared before me.  There could be another motion to

16   hold you in custody while you're awaiting trial; they could

17   issue a warrant for your arrest; there can be negative

18   consequences.

19          Also, if you commit any crimes while you are on

20   release -- in addition to any penalties you face for that

21   crime, you may face an additional penalty for having

22   committed a crime while on release.

23          Finally, you are required to appear in court as

24   directed while you are on pretrial release.  Your failure to

25   appear in court as directed could also lead to -- could lead

1    to a warrant for your arrest or revocation of your release,

2    or your detention pending trial.  These warnings will also

3    be in the release order that we will provide.

4           Thank you.

5           That concludes this hearing.  You are all excused.

6    Have a good evening.

7           THE DEFENDANT:  Thank you.

8           (Whereupon, the hearing concludes, 6:13 p.m.)

9                      **CERTIFICATE**

10          I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby
     certify that the foregoing constitutes a true and accurate
11   transcript of my stenographic notes, and is a full, true,
     and complete transcript of the proceedings to the best of my
12   ability.

13          PLEASE NOTE:  This hearing was held via
     videoconference and telephonically in compliance with the
14   COVID-19 pandemic stay-safer-at-home orders and is therefore
     subject to the limitations associated with the use of
15   technology, including but not limited to telephone signal
     interference, static, signal interruptions, and other
16   restrictions and limitations associated with remote court
     reporting via telephone, speakerphone, and/or
17   videoconferencing capabilities.

18          This certificate shall be considered null and void
     if the transcript is disassembled in any manner by any party
19   without authorization of the signatory below.

20
          Dated this 15th day of March, 2021.
21

22   /s/ Elizabeth Saint-Loth, RPR, FCRR
     Official Court Reporter
23

24

25