### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **No. 21-CR-78-EGS** |
| | : | |
| **JOHN EARLE SULLIVAN** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully opposes the defendant's "Motion to Suppress Custodial Statements." The defendant, John Earle Sullivan, specifically seeks to suppress pre-arrest statements he voluntarily made to an FBI agent while at his own home on January 11, 2021 – days before Sullivan was charged – when the agent asked him some questions during a visit to obtain video footage that Sullivan had previously offered to provide the FBI. Specifically, Sullivan made statements acknowledging that while he knew he could be heard stating that he had a knife in the publicly posted video of himself inside the Capitol Building, he did not in fact have a knife or weapon; Sullivan alternately claimed that he was just responding to something the person next to him had said, that he was joking, and that he was trying to fit in with the crowd when he so stated.

The defendant now seeks suppression on grounds that he should have been Mirandized because his January 11, 2021 statements were "custodial." This contention is unsupported by both the facts and the law. The circumstances of the defendant's statements, as reflected on a recording of the entire visit, refute the defendant's claim of "custodial interrogation" as a factual matter, and the defendant's arguments run contrary to established caselaw. No evidentiary hearing is

warranted as the entire visit was captured on video, which is hereby proffered to the Court as an exhibit for its review.  The defendant's motion to suppress should be denied on the briefs.

## **FACTUAL BACKGROUND**

On January 7, 2021, the defendant, John Earle Sullivan, participated in a voluntary interview with an FBI agent in Washington, D.C.  The defendant stated that he was at the U.S. Capitol on January 6, 2021, followed the crowd as it pushed past Capitol Police, and entered the U.S. Capitol Building with others through a broken window.  The defendant stated he was wearing a ballistics vest and gas mask.  The defendant further stated that he had been present at the shooting of a woman by a Capitol Police officer and that he had filmed the incident.  The defendant showed the interviewing agent the footage he had taken, which he stated that he had uploaded to the Internet.  At the conclusion of the interview, the defendant stated that he was willing to voluntarily provide a copy of all footage he recorded within the U.S. Capitol to law enforcement authorities.

On January 9, 2021, another FBI officer made contact with Sullivan at one of the phone numbers Sullivan provided during his interview to follow up on Sullivan's offer to voluntarily provide his footage.  Sullivan sent a link to download a single video that he had taken on January 6.  The video was similar to a video Sullivan had publicly posted on his YouTube account.

As recounted at greater length in the charging documents and previous pleadings, the video captured the defendant saying at various points: "There are so many people. Let's go. This shit is ours! Fuck yeah," "We accomplished this shit. We did this together. Fuck yeah! We are all a part of this history," and "Let's burn this shit down."  It showed the defendant extending his hand to help pull up an individual climbing a wall to reach a plaza just outside the Capitol Building entrance, saying "You guys are fucking savage.  Let's go!"  The defendant's ballistics gear and gas mask was visible, and the defendant was captured climbing through a broken window to enter

2

the Capitol Building.  The video further recorded several encounters between the defendant and law enforcement officers, including ones where the defendant told the officers that "you are putting yourself in harm's way," "the people have spoken," and "there are too many people, you gotta stand down, the people out there that tried to do that shit, they got hurt, I saw it, I'm caring about you."  At a later point, after someone lunges their body against a door, the defendant can be heard saying, "That's what I'm sayin', break that shit."

As relevant here, the video showed the defendant joining a crowd gathered before the main entrance to the House Chamber in the U.S. Capitol.  There, the defendant could be heard telling other individuals, "there's officers at the door," and then could be heard – but not seen – saying, "Hey guys, I have a knife. I have a knife.  Let me up."  Later in the video, the defendant then approaches the doorway to the Speaker's Lobby, a hallway which connects to the House Chamber. There too, the defendant can be heard – but again not seen – saying, "I have a knife…. Let me through I got a knife, I got a knife, I got a knife."

On January 11, 2021, FBI Special Agent Matthew Foulger from the Salt Lake City Field Office – the defendant's home district – sought to visit the defendant to receive the remaining footage.  Agent Foulger called the defendant on his two numbers multiple times between 12:28pm and 1:03pm before heading to Sullivan's home:



Agent Foulger also texted the defendant at 12:30 pm – a text that the defendant himself later posted on his Twitter account, "realjaydenx," redacting the agent's name:



As reflected on the recording,[1] Agent Foulger and a colleague, an FBI Task Force Officer, knocked on the defendant's door and waited for him to open it before greeting him and identifying themselves as law enforcement officials.  Defendant immediately and repeatedly invited Agent Foulger and his colleague in:

> John Sullivan ("JS"): Hello?
>
> Agent Foulger ("AF"): John Sullivan?
>
> JS: Yeah.
>
> AF: How are you?
>
> JS: Good, how are you?
>
> AF: I'm Matt Foulger with the FBI.
>
> JS: Well, come on in.
>
> AF: This is Jen.
>
> JS: Yeah, come on in.
>
> AF: Do you know why we're here?
>
> JS: Probably. Capitol stuff?
>
> AF: Yeah. So, last week you spoke with our colleagues in D.C., right? And, they said you had additional video.
>
> JS: I do, yeah.
>
> AF: Do you mind if we come in?
>
> JS: Yeah, yeah. [*Defendant motions them in*.]

*See* Exh, A (approx. 5:14-5:40).  Once inside, they exchanged pleasantries.  Agent Foulger asked, "Do you mind if we ask you a couple questions?" and the defendant agreed ("Yeah.").  *See* Exh. A (approx. 8:05).  The ensuing conversation lasted approximately 35 minutes.

Throughout the approximately 35-minute dialogue, the tone and demeanor of all parties was cordial and the defendant readily answered the agent's questions while copying his video files onto a thumb drive the agent had brought.

---

[1] *See* Exh. A (1-11-2021 Recording), transmitted to the courtroom deputy through USAFx.

In the course of the interview, the agent asked the defendant whether he had a weapon on January 6, 2021, while inside the Capitol Building:

> AF: Did you have a wea—a gun on you or anything?
>
> JS: No, I had no gun. No guns, no weapons
>
> AF: No knife or anything like that?
>
> JS: It is illegal to carry that—all of that stuff.
>
> AF: Oh, for sure. I just want—I mean, if I'm not a pro-Trumper, and, you know, I'm going into— the lion's den, I would wanna, you know, at least feel secure, so.
>
> JS: Yeah. I mean, I flew in so, like, I can't bring a gun on the plane— or anything like that, so yeah.
>
> …
>
> AF: Okay. Um, I just ask the weapons question cause I think you sent a link to one of our agents—um, of a fifty-minute clip when you guys go in. I think in there—I wanna say, uh—
>
> JS: I know what you're talking about.
>
> AF: —it was probably your voice—about having a knife.
>
> JS: Yeah, I do know what you're talking about. So, I'm talking to the person next to me, like, words you can't hear because, like, all the camera can hear is my voice. You really can't hear anybody outside or around me. So, he's talking to me about something like that. But, I do remember that part of, like, me saying like, "Oh, yeah, I have a knife on me." I think it was more in a joking manner, like, not literally have a knife on me. Like, at no point do I plan to, like, stab somebody. Um, so like I just don't have a knife on me on that—in that instance.
>
> AF: Okay.
>
> JS: But it was more like—I mean I said a lot of things throughout that entire video.
>
> AF: Yeah.
>
> JS: But it was only, like, to relate to the person next to me, so that they don't feel the need to, like, just start fucking me up.

*See* Exh. A (approx. 14:45-16:35).

The defendant and Agent Foulger remained cordial as they parted ways:

> AF: Thank you, sir.
>
> JS: Let me know if you need anything else.
>
> AF: Okay.
>
> JS: I'll be happy to—

6

AF: Awesome.

JS: Thank you guys.

Task force officer: Appreciate it.

AF: Yeah, thank you guys.

JS: Take care.

AF: Likewise.

*See* Exh. A (approx. 43:45-44:00).

On January 13, 2021, the defendant was charged by complaint with violations of 18 U.S.C. §§ 231(a)(3) & 2 (Civil Disorders); 18 U.S.C. § 1752(a) (Knowingly Entering or Remaining in a Restricted Building or Grounds without Lawful Authority); and 40 U.S.C. § 5104(e)(2) (Violent Entry and Disorderly Conduct on Capitol Grounds), and the defendant was arrested the following day. The defendant was not charged with any weapons count.

On February 3, 2021, a grand jury in the District of Columbia returned an indictment against the defendant charging violations of 18 U.S.C. §§ 1512(c)(2) & 2 (Obstruction of an Official Proceeding and Aiding and Abetting); 18 U.S.C. §§ 231(a)(3) & 2 (Civil Disorders and Aiding and Abetting); 18 U.S.C. §§ 1752(a)(1) (Entering or Remaining in a Restricted Building or Grounds) and 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds); and 40 U.S.C. §§ 5104(e)(2)(D) (Disorderly Conduct in a Capitol Building) and 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building). Again, the defendant was not indicted on any weapons count.

Subsequent to that date, law enforcement obtained and reviewed video from an individual present at the scene when Sullivan stood before the main entrance to the House Chamber and was heard – but not seen – saying, "Hey guys, I have a knife. I have a knife. Let me up." The individual's video showed the defendant holding up the black handle to a knife at the very moment that he made the statement about having a knife.

On May 19, 2021, based on that video as well as additional evidence gathered in the course of the investigation, a grand jury returned a Superseding Indictment that added, *inter alia*, weapons charges and a false statements charge against the defendant.  The Superseding Indictment charges violations of 18 U.S.C. §§ 1512(c)(2) & 2 (Obstruction of an Official Proceeding and Aiding and Abetting); 18 U.S.C. §§ 231(a)(3) & 2 (Civil Disorders and Aiding and Abetting); 18 U.S.C. §§ 1752(a)(1) and 1752(b)(1)(A) (Entering or Remaining in a Restricted Building or Grounds with a Dangerous Weapon); 18 U.S.C. §§ 1752(a)(2) and 1752(b)(1)(A) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Dangerous Weapon); 40 U.S.C. § 5104(e)(1)(A)(i) (Unlawful Possession of a Dangerous Weapon on Capitol Grounds or Buildings); 40 U.S.C. § 5104(e)(2)(D) (Disorderly Conduct in a Capitol Building); 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building); and 18 U.S.C. § 1001(a)(2) (False Statement or Representation to an Agency of the United States).

## ARGUMENT

The defendant's motion argues that his statements denying having a knife, and justifying why he had stated that he had a knife despite not having a knife, should be suppressed because they were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966).  Specifically, the defendant's motion contends that he made the statements in the course of a "custodial interrogation" on January 11, 2021 by Agent Foulger at his home.  ECF 46, at 4.  The claim is meritless and should be denied.  Moreover, because the entire visit was captured on a recording that leaves no significant factual issues as to what transpired, the defendant's motion does not require an evidentiary hearing.

**I.      The Defendant Did Not Undergo "Custodial Interrogation" on January 11, 2021.**

As is well-established, *Miranda* warnings are only required "where a suspect *in custody* is subjected to interrogation."  *United States v. Vinton*, 594 F.3d 14, 26 (D.C. Cir. 2010) (emphasis

added).   The protections offered by *Miranda* only apply in the instance of "custodial interrogation," which is when a reasonable person in the defendant's position would have understood that he was subject to a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).   As the Supreme Court has explained, "[v]olunteered statements of any kind are not barred by the Fifth Amendment" and "any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence" without *Miranda* warnings.  *Miranda*, 384 U.S. at 478; *see also United States v. Sheffield,* 799 F. Supp. 2d 22 (D.D.C. 2011), *aff'd.* 832 F.3d 296 (D.C. Cir. 2016); *United States v. Samuels,* 938 F.2d 210, 214 (D.C. Cir. 1991).  The crux of the issue is thus whether, given the circumstances, "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). "Relevant factors include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." *Howes v. Fields*, 565 U.S. 499, 509 (2012) (internal citations omitted).

As far as the location of questioning, interviews in a suspect's home are generally non-custodial.  *Beckwith v. United States*, 425 U.S. 341 (1976); *see also* 2 WAYNE R. LAFAVE, CRIMINAL PROCEDURE § 6.6(e) (3d ed. 2007) ("courts are much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings"); *United States v. Faux*, 828 F.3d 130, 135-36 (2d Cir. 2016) ("[C]ourts rarely conclude, absent a formal arrest, that a suspect questioned in her own home is 'in custody.'"); *see also United States v. Mitchell*, 966 F.2d 92, 98–99 (2d Cir. 1992) (reversing district court where in–home interview was "cooperative" and there was no speech or action that could reasonably be

taken as intimidating, coercive, or restricting defendant's freedom of action).  In *Faux*, for instance, the Second Circuit found the circumstances to be noncustodial because the tone of the questioning was largely conversational; there was no indication that the agents raised their voices, showed firearms, or made threats; the individual's movements were monitored but not restricted, certainly not to the degree of a person under formal arrest; and she was thus never "completely at the mercy of" the agents in her home. 828 F.3d at 139; *see also United States v. Luck*, 2017 WL 1192899 (6th Cir. Mar. 31, 2017) (agents did not brandish weapons or block exits, encounter calm and relatively short); *United States v. Lamy*, 521 F.3d 1257 (10th Cir. 2008) (questioning in the "common area of his home, during which his mother came and went from the room" was not custodial).  Courts in this jurisdiction have similarly found, in situations where the interview takes place in a familiar or neutral setting, that defendants were not "in custody."  *See, e.g., Vinton*, 594 F.3d at 27 ("Most of the statements Vinton claims were improperly admitted were made by him while he was sitting in his car…. At the time he made these statements, Vinton was not 'in custody' and faced an 'ordinary,' 'noncoercive' traffic stop."); *United States v. Robinson*, 256 F. Supp. 3d 15, 26 (D.D.C. 2017) (interview setting "was not a police statement or any other characteristically police-dominated or coercive location, but was instead an office inside of Defendant's own place of work").

Here, a reasonable person in the defendant's position "would have understood that he was not subject to a formal arrest or restraint of the degree associated with a formal arrest, and would have felt free to terminate the interview."  *Robinson*, 256 F. Supp. 3d at 25.  At the outset, the defendant had himself created the opening for such a visit by previously offering to provide his footage.  Agent Foulger did not arrive wholly "unannounced," ECF 46, at 6, but rather called and texted the defendant in advance – calls that the defendant appeared to acknowledge receiving

("Was that you calling me?") and a text the defendant admitted receiving by later posting it on Twitter.  In any event, when the two agents arrived in the afternoon of January 11, 2021, they clearly identified themselves as law enforcement, and the defendant chose to invite and wave them in, repeatedly, into his own home.  The defendant himself appeared unsurprised by the visit and posited that they must be there for "Capitol stuff."  The presence of the two agents, moreover, one of whom remained largely silent throughout, cannot be characterized as transforming the defendant's home into a "police-dominated environment."  ECF 46, at 5.  There were no threats, intimidating conduct, promises, or brandishing of weapons by the two agents, and the defendant's motion does not suggest otherwise.[2]   No physical restraints were imposed on the defendant, and the defendant was not placed under arrest at the end of the interview. The defendant does not contend otherwise.

As in *Robinson* – a case where an interview at the suspect's workplace was deemed non-custodial, even as authorities were executing a search warrant at that time – the defendant was not "ordered to submit to an interview" but rather "*asked.*"  *Id.* (emphasis in original).  The defendant here not only agreed to proceed when the agent asked, "Do you mind if we ask you a couple questions?" but he appeared, as in *Robinson*, "willing, even eager, to engage in the interview," responding with some enthusiasm and giving answers of substantial length with little prompting. *Id.* at 26.  The parties were amicable in tone, "calm and patient throughout the interview." *Id.*  The defendant "had a thorough opportunity to reconsider his decision to be interviewed" but stayed. *Id.*  The 35-minute interview was "not particularly long."  *See id.* ("The interview was not

---

[2] The defendant himself stated that he was armed: "There's a gun right here by the way.  Just so you know.  So that you don't feel too concerned."  The agent responded, "Thanks.  Okay.  We're also armed but…"  The defendant stated, "Oh, you're armed, too?  Okay, cool."  The agent stated, "Yeah, we have to be," and the defendant said, "Yeah, of course."  Exh. A (approx. 7:40).

particularly long, lasting somewhere between 45 minutes and a little over an hour…."); *United States v. Levenderis*, 806 F.3d 390, 400 (6th Cir. 2015) (defendant was not in custody; "the length of questioning during the first interview was relatively brief, approximately thirty minutes") *compare United States v. Patterson*, 393 F. Supp. 3d 456, 469 (E.D. La. 2019) (hours-long interview by agents was still non-custodial due to ability of defendant to leave, among other factors). And at the conclusion of the questions, the defendant thanked the agents and told them to let him know if they needed anything else.

To be sure, as the defendant states, courts have found in certain exceptional cases that in-home interviews have had sufficient indicia of compulsion to be rendered "custodial." *E.g., United States v. Savoy*, 889 F.Supp.2d 78, 106–10 (D.D.C. 2012) (finding custody wherein 16 armed law enforcement in "tactical gear" forcibly entered defendant's home in early morning and proceeded to handcuff defendants and his family); *Orozco v. Texas*, 394 U.S. 324 (1969) (finding custody when four officers entered defendant's bedroom at 4:00 a.m. after being told he was asleep and instructed him that he was "not free to go where he pleased but was 'under arrest'"). But those circumstances are wholly inapposite and distinguishable to the facts of this case.

Nor is it significant if the agent – in addition to his *bona fide* interest in following up on the defendant's offer to provide additional footage – had already "identified John Sullivan as a participant in the events of January 6, 2021" (based on video that Sullivan himself had already posted online and voluntarily provided to the FBI). ECF 46, at 5. As the Supreme Court has said, "'It was the compulsive aspect of custodial interrogation, and *not the strength or content of the government's suspicions at the time the questioning was conducted*, which led the court to impose the Miranda requirements with regard to custodial questioning.'" *Beckwith*, 425 U.S. at 346–47 (emphasis added); *see also Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) ("Nor is the

12

particularly long, lasting somewhere between 45 minutes and a little over an hour…."); *United States v. Levenderis*, 806 F.3d 390, 400 (6th Cir. 2015) (defendant was not in custody; "the length of questioning during the first interview was relatively brief, approximately thirty minutes") *compare United States v. Patterson*, 393 F. Supp. 3d 456, 469 (E.D. La. 2019) (hours-long interview by agents was still non-custodial due to ability of defendant to leave, among other factors). And at the conclusion of the questions, the defendant thanked the agents and told them to let him know if they needed anything else.

To be sure, as the defendant states, courts have found in certain exceptional cases that in-home interviews have had sufficient indicia of compulsion to be rendered "custodial." *E.g., United States v. Savoy*, 889 F.Supp.2d 78, 106–10 (D.D.C. 2012) (finding custody wherein 16 armed law enforcement in "tactical gear" forcibly entered defendant's home in early morning and proceeded to handcuff defendants and his family); *Orozco v. Texas*, 394 U.S. 324 (1969) (finding custody when four officers entered defendant's bedroom at 4:00 a.m. after being told he was asleep and instructed him that he was "not free to go where he pleased but was 'under arrest'"). But those circumstances are wholly inapposite and distinguishable to the facts of this case.

Nor is it significant if the agent – in addition to his *bona fide* interest in following up on the defendant's offer to provide additional footage – had already "identified John Sullivan as a participant in the events of January 6, 2021" (based on video that Sullivan himself had already posted online and voluntarily provided to the FBI). ECF 46, at 5. As the Supreme Court has said, "'It was the compulsive aspect of custodial interrogation, and *not the strength or content of the government's suspicions at the time the questioning was conducted*, which led the court to impose the Miranda requirements with regard to custodial questioning.'" *Beckwith*, 425 U.S. at 346–47 (emphasis added); *see also Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) ("Nor is the

12

requirement of warnings to be imposed simply … because the questioned person is one whom the

police suspect.  Miranda warnings are required only where there has been such a restriction on a

person's freedom as to render him 'in custody.'").  Here, however "active" the "investigation into

the events of January 6, 2021," ECF 46, at 6, and whatever suspicions were harbored, the hallmarks

of custodial interrogation were not present.

## II.    No Evidentiary Hearing is Warranted.

The defendant's requested evidentiary hearing is not warranted because for more than fifty

years, the law in this Circuit has been that "[a] defendant is entitled to an evidentiary hearing on

his motion to suppress 'only upon factual allegations which, if established, would warrant relief.'"

*United States v. Thornton*, 454 F.2d 957, 967 n. 65 (D.C. Cir. 1971); *accord United States v. Law*,

528 F.3d 888, 903–04 (D.C. Cir. 2008).  The entirety of the defendant's engagement with the two

agents was recorded, leaving no significant factual issues as to what transpired.  The facts as

reflected on that video recording make plain that no *Miranda* violation occurred.

## <u>CONCLUSION</u>

WHEREFORE, the United States respectfully requests that the defendant's Motion to

Suppress be denied.

Respectfully submitted,

CHANNING D. PHILLIPS
United States Attorney
D.C. Bar No. 415793

*/s/ Candice C. Wong*

By:    Candice C. Wong
D.C. Bar No. 990903
Assistant United States Attorney
555 4th Street, N.W., Room 4816
Washington, D.C. 20530
(202) 252-7849
candice.wong@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 7, 2021, I caused a copy of the foregoing motion to be served on counsel of record via electronic filing.

<u>*/s/ Candice C. Wong*       </u>
Candice C. Wong
Assistant United States Attorney
