**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-CR-78 (RCL)** |
| **JOHN SULLIVAN,** | |
| **Defendant.** | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court vary upwards to sentence John Sullivan to 87 months of incarceration, 3 years of supervised release, a fine in the amount of $90,875, $2,000 in restitution, and the mandatory assessment of $500 total for each felony conviction and $20 total for each Class B Misdemeanor.

**I.     INTRODUCTION**

The defendant, John Sullivan, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1] Sullivan brought to the Capitol a retractable knife with an almost four inch blade, which

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts,

—during two of the most serious inflection points of January 6, 2021—he offered up to rioters at the House Main Door and the Speaker's Lobby Door.

Earlier in the day, Sullivan, a self-proclaimed "activist" from Utah, joined the growing crowd on the West Plaza of the Capitol. Sullivan encouraged violence stating, "we're taking this shit to the ground", "burn this shit down," and "let's fuck this shit up." After United States Capitol Police (USCP) were forced to retreat through the scaffolding, Sullivan followed, and celebrated as the rioters took over the Upper West Terrace (UWT). Sullivan assisted other rioters scaling the UWT wall before entering the Capitol through a smashed-out window adjacent to the Senate Wing Door. Inside, Sullivan traveled throughout the U.S. Capitol, including near the Senate Carriage Door, House Main Doors, and the Speaker's Lobby. At these locations, Sullivan advocated for violence while attempting to convince USCP to stand down. As rioters besieged the House Main Door and clamored to break it down, Sullivan held up and offered to rioters the knife he had shown and described to his viewers on earlier videos: a Smith & Wesson M&P tactical knife, with the 3.74" blade retracted. When rioters failed to breach the door, Sullivan and the mob pivoted to the Speaker's Lobby Door, where he again told rioters he had a knife to get to the front of the mob— even as House members were evacuating and sheltering in place. Sullivan encouraged other rioters as they broke through the Door windows, shouting "Go! Go! Let's go! Get that shit!"

The government recommends that the Court sentence Sullivan to 87 months of incarceration, an upward variance sentence that reflects the gravity of Sullivan's conduct on

---

but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

January 6 and his utter lack of remorse for his actions.

## II.   FACTUAL BACKGROUND

### A.   The January 6, 2021 Attack on the Capitol

The government refers the Court to the trial transcripts and the Statement of Facts filed in this case, ECF No. 1, for a shorter summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.9 million dollars.

### B.   Sullivan's Role in the January 6, 2021 Attack on the Capitol

#### *Pre-January 6 Social Media*

The evidence presented at trial showed that starting in 2020, Sullivan, a former cyber-security salesman, used different digital platforms and personas to hold himself out as an activist. The personas included JaydenX and Insurgence U.S.A., and some of the platforms included Twitter (now X), Facebook, Instagram, and his own website.



*Exhibit 1126: The background of Sullivan's Website prior to January 6, where he described himself as an activist.*

On his platforms, Sullivan made his objectives clear: to cause pure chaos and disruption to the status quo. Sullivan alternated between advertising legitimate protests and broadcasting violent anti-establishment rhetoric. 11/14/13 Tr. Trans. at 63-64. Throughout the fall of 2020, Sullivan posted videos and photos referencing engagement in riots. *See, e.g.*, GEX 1002.3, 1101, 1113, 1115. Sullivan also shared instructional posts on how to make Molotov cocktails and how take down a monument. GEX 1110 and GEX 1117. In December 2020, Sullivan made a 17-minute instructional video on how to dress for a protest, which included dressing in all black with a ballistic vest and carrying weapons for protection. *See* GEX 1002.3. During the video, Sullivan showed his Smith & Wesson M&P Knife—the one he would ultimately bring to the Capitol. *Id*. at 11:49. Sullivan also directed viewers to his website where he listed some of the items shown in the video for sale.

4



*Still from GEX 1002.3 at 11:49: Sullivan holding up his retractable M&P knife during his online tutorial on how to dress for "protests."*

Going into winter of 2020, Sullivan began to advocate for a violent dismantling of the government. In one Instagram post, Sullivan posted "We will have live updates on the location for tonight's purge. Spread the message. Let the electoral purge commence." GEX 1102. In December 2020, Sullivan tweeted, "Riots are meant to bring change, so purge the world with fire," and "An armed revolution is the only way to bring about change effectively." GEX 1107, 1105. On January 2, 2021, Sullivan tweeted, "Fuck The System-Time To Burn It All Down," with an accompanying still from a TikTok video of him burning an American flag. GEX 1104.




*GEX 1107(L) and GEX 1104(R): Sullivan posted inflammatory messages on social media.*

In the weeks and days leading into January 6, 2021, Sullivan made clear he knew the significance of what would be occurring that day—both the certification and the rally. Sullivan made and posted a video explaining the details of the certification process. GEX 901.18. On December 30, 2020, Sullivan tweeted "Definitely don't surround his house…" with a photo of Mitch McConnell. GEX 1103. In a January 1, 2021 tweet, Sullivan asked others to come out and counter-protest on January 6. GEX 1104 and 1420 (not admitted at trial).



*GEX 1104: Sullivan, fomenting violence, also encouraged counter-protests on January 6.*



*GEX 1420 (not admitted at trial)*

***Approach to the Capitol***

On January 6, Sullivan attended the 'Stop the Steal' rally with Jade Sacker, a woman who was making a documentary on Sullivan's anti-government activities.[2] As rioters began to breach the Capitol grounds, Sullivan and Sacker walked down Constitution Avenue towards the Capitol. During this walk, Sullivan made his intentions clear to those around him saying, "They broke inside, hell yeah I'm going up" (GEX 701 at 4:20), and "I'm going all the way to the top." (GEX 701 at 4:30). Sullivan was dressed for a riot: he wore all black and a tactical vest with ballistic plates and carried a gas mask and a mega-horn. Making his way up the lawn, Sullivan stated, "we're taking this shit to the ground" and "let's fuck shit up." (GEX 660 at 2:23-4:01). As he neared the West Plaza, Sullivan took a break to situate himself and his gas mask before proclaiming he was going inside. *See* GEX 660.

---

[2]Information about Sacker's film is available at https://variety.com/2023/film/news/documentary-house-divided-adopted-brothers-jan-6-riot-jade-sacker-john-sullivan-1235479585/.   A trailer, released around the time of her testimony, is available at https://tinygiant.tv/projects/a-house-divided-sizzle/.



*Still from GEX 660, showing Sullivan's attire as he walked up the west lawn.*

### Breach of the West Front and Police Line

Once Sullivan reached the West Plaza, he embedded himself in the crowd, telling Sacker he needed to "start some chants" (GEX 662 at 1:40), which Sullivan did by using his megaphone. Sullivan exclaimed "we about to burn this shit down!" GEX 662 at 1:48. Sullivan made his way to the foot of the Inaugural stage, where he warned other rioters to cover their faces, insinuating that law enforcement would be investigating anyone present. GEX 710 at 4:10. The crowd gathered in front of the police line protecting the stage steps grew increasingly agitated. Sullivan seized upon this and used his megaphone to further rally the crowd, saying things to the police like: "You guys work for us. Fuck you," "If we don't get it, we're burning this shit down," and "Who do you protect? Who do you serve?" *See* GEX 710 at 8:00-8:30.



*Still from GEX 663 at :03 showing Sullivan using his megaphone.*

As the crowd overwhelmed officers, pushing them back through the scaffolding, Sullivan celebrated and urged the crowd on, yelling "Get in that shit, let's go! Move, Move, Move! Storm that shit!" GEX 710 at 9:05-9:15. Sullivan put on his gas mask and joined the push forward. While stopped at a new police line, inside the scaffolding, Sullivan giddily called the unfolding events a "Mother fucking revolution," and encouraged others by yelling, "Let's go, we're taking this shit!" GEX 701 at 4:15-4:30. When the police line at this location also fell, officers retreated to the Upper West Terrace ("UWT"), where they made a last-ditch effort to establish a line using barricades. Sullivan joined the other rioters up the steps and made his way to the front where he told an officer "There's too many people," moments before the officer gave up positioning. GEX 701 at 12:07. After the officer left, Sullivan kicked over a barricade, opening space for himself and others to access the UWT. GEX 669 at 1:17.

As he traversed the UWT, Sullivan fist bumped another rioter (GEX 669 at 1:40) and then,

from a viewpoint over the Northwest lawn, called the chaos "beautiful." GEX 701 at 14:00.

Sullivan triumphantly put his hand above his head and let out a celebratory whoop. GEX 670.

After this brief celebration, Sullivan sprung back into action, cheering on rioters scaling the wall

to the Upper West Terrace, and even helping pull one rioter up and over the railing. GEX 701 at

14:10-14:25 and 627. Sullivan even complimented the climbers, calling them "savage," and then

riled up the crowd below one more time by yelling "LET'S FUCKING GOOO." GEX 701 at

14:25-14:30.



*Still from GEX 670: Sullivan jubilantly cheered on the rioters.*



*Still from GEX 627 showing Sullivan helping a rioter scale the wall.*

### Sullivan's Entry into the Capitol

Sullivan then turned his attention to the main prize: the Capitol building. Knowing that what he was about to do was illegal, Sullivan told Sacker he would continue to film, but only as a "good ploy so I don't get arrested." GEX 628 at :28. Sullivan put back on his gas mask and walked towards the Senate Wing Doors that had been breached minutes prior. At 2:15 p.m., Sullivan

entered the Capitol through a smashed-out window adjacent to the doors. GEX 305 at :57.



*Still from GEX 305: Sullivan entered the U.S. Capitol through a broken window.*

### *Senate Carriage Doors*

After entering, Sullivan told his fellow rioters, "We gotta get this shit burnt!" as the crowd walked towards the Senate Carriage Doors. GEX 701 at 17:35. At the Senate Carriage Doors, officers ordered Sullivan to leave, but he refused, arguing with an officer for several minutes and using his body weight to resist the officer's attempts to guide Sullivan out of the building. GEX 306 at 2:15 and 307 at 2:00. Sullivan then took advantage of a distraction to turn back further into the building. *Id.*

On his way back towards the Senate Wing doors, Sullivan was stopped by a line of officers desperately trying to hold off rioters, including Officer A.W., who testified at trial. At that moment, Vice President Pence and his family were directly above Sullivan and the other rioters positioned at the Carriage Doors. Officer A.W. testified that his "specific job," beyond expelling rioters, was to not "let [rioters] in a certain direction that is going to be the route that we are going to try to get

the vice president down." 11/09/23 Tr. Trans. at 115. Officer A.W. pleaded with Sullivan to step back so officers could clear the exit for Sullivan and others. Sullivan ignored these pleas and instead tried to intimidate the officers with comments such as "they all just retreated. All your officers just went that way, bro." GEX 701 at 21:20-21:50. Officer A.W. recognized these comments from other riots, a tactic designed as "a distraction . . . to take you away from what you are supposed to do." 11/09/23 Tr. Trans. At 118.

The crowd eventually overwhelmed Officer A.W. and his fellow officers and pushed back into the building. Sullivan retraced his steps and made his way into an office just past the Senate Wing Doors. Inside the office, Sullivan banged on the glass window to get the attention of those outside, exclaiming "Fuck ya we did this shit! We took this shit!" GEX 701 24:25-24:30. Sullivan's banging broke the window, which he laughed off, saying, "No one got that on camera." *Id*. at 24:55-25:05. Sullivan immediately exited the office after breaking the window. He followed the crowd up one level to the Rotunda, where he once again celebrated and kissed Sacker in apparent elation. GEX 311 at 1:43.



*Still from GEX 311 capturing Sullivan bouncing with excitement as he is filmed by Sacker.*

14

### *House Main Doors*

From the Rotunda, Sullivan walked through Statuary Hall towards the House of Representatives. At approximately 2:28 p.m., Sullivan and the mob began to converge in the Will Rogers Hallway, putting them within feet of the House Chamber. Only a handful of officers stood between the mob and members of the House. The House had recessed only ten minutes prior and had yet to evacuate. *See* GEX 401. The mob, including Sullivan, repeatedly tried to talk their way past officers. Sullivan told others he was ready because he had "been in so many riots," and that he was "ready bro." GEX 701 30:20-31:20. In other words, Sullivan knew that the police line was about to be broken.



*Still from GEX 315 showing Sullivan engaging with officers outside the House Chamber.*

At approximately 2:35 p.m., the mob pushed officers back, through two sets of doors, to the House Chamber Main Door. As rioters pushed forward and the line fell, Sullivan at the front once again sought to demoralize officers, stating, "I would just stop. . . . You're not helping, you're

gonna get me hurt."   GEX 701 at 37:05. Moments later, when another rioter shouted, "no violence," Sullivan chided, "It's too late for that." GEX 701 at 37:25. Soon thereafter, Sullivan disparaged another rioter's called for peace, telling them "Fuck that shit."   GEX 701 at 38:00. As the members of the mob clamored to knock out the windows in the House Main Door, even handing up helmets, Sullivan made a crucial decision to offer help. Shouting "I have a knife," Sullivan held up his Smith & Wesson M&P knife—the same knife he had shown on a pre-January 6 video, with its 3.74" blade retracted—to the crowd. *See* GEX 692 at :09 and GEX 701 at 40:10.



*Still from GEX 692 at :09 showing Sullivan holding the knife outside the House Chamber Doors.*

As Sullivan and the rioters continued to press forward outside, inside the House Chamber

police officers stood with guns pointed at the door, protecting those evacuating from the House floor. GEX 610. When rioters expressed a belief that they were about to access the House, Sullivan responded "Let's go, let's go! Pull that mother fucker out this bitch!" GEX 701 at 42:15. Deputy Chief T.L. considered Sullivan's statement "a threat to my officer right next to the door," referring to a USCP officer stuck at the front of the mob. 11/13/23 Tr. Trans. at 45. When the mob's efforts to breach the House Chamber Main Door failed, Sullivan followed other rioters to the Speaker's Lobby, located on the back side of the House chamber.

### *Speaker's Lobby*

Shortly before the mob's arrival, three USCP officers stood guard at the doors to the Speaker's Lobby. At that time, Deputy Chief T.L. was leading the evacuation of staff and members from the opposite end of the Lobby. 11/13/23 Tr. Trans. at 53-54. As the mob arrived, the evacuation was ongoing while some staff, press, and members were stuck sheltering inside the House Chamber Gallery. One rioter began punching over the officers' heads and shoulders, cracking the doors' windowpanes. GEX 605. As he arrived, Sullivan pushed his way to the front of the crowd and, once again, offered up his knife for the rioters proclaiming, "Let me through, I have a knife." GEX 701 at 44:00. Agent K.Y., standing guard at the door, testified that this proclamation was concerning because a knife "could be used to hurt the officers, anyone there." 11/13/23 Tr. Tran. at 146.



*Still from GEX 701 showing Sullivan's arrival and the damage to the Speaker's Lobby Doors.*

Here, at the front of the increasingly agitated mob, Sullivan once again attempted to pressure and intimidate police officers into leaving by telling them he did not want them to get "hurt." GEX 701 at 45:05. Agent K.Y. testified that Sullivan's words provided no comfort or promise of safety, stating "There is so much going on, you are hearing everything from, we don't want to hurt you to people then just pushing you and – I didn't take it seriously." 11/13/23 Tr. Trans. at 146. Eventually the crowd became so agitated that the officers thought it best to move from the area -- believing better-equipped officers would have enough time to take their place. 11/13/23 Tr. Trans. at 148.

Following the officers' retreat, Sullivan immediately encouraged other rioters to break down the door, saying, "Go! Go! Let's go! Get that shit!" as rioters began kicking the doors and smashing out the windowpanes. GEX 701 at 45:00-45:20. Just beyond the doors, additional officers were positioned to protect the remaining House staff, press, and members who had yet to evacuate. Rioters were successfully able to break out the windowpanes, leaving a route to the House Chamber accessible to rioters. In response, officers drew their guns, which Sullivan noted. One rioter jumped through a smashed-out pane and was immediately shot by one of the officers

18

behind the door.

Following the shooting, officers, including K.Y., ordered rioters to both leave and clear a path so that first aid could respond. Sullivan did neither. As others left or gave aid, Sullivan filmed the mortally wounded rioter for approximately two minutes before he was pushed away. GEX 701 at 45:53-47:53. Even then, Sullivan still did not leave, instead staying around to brag to other rioters about what he had witnessed and sharing his social media handle. When not promoting his YouTube channel, Sullivan intensely criticized officers over the shooting. *See* GEX 701 and 901.14.

It was not until twelve minutes after the shooting that Sullivan was finally forced out of the building by back-up officers. *See* GEX 320. As Sullivan walked away from the Capitol, he called to a friend to brag about his experience the Capitol. *See* GEX 688. Upon hearing some of Sullivan's description of the chaos caused by rioters, the listener said, "as much as I wish it was us, we get to swoop in and save the day" insinuating that Sullivan's associates wished to be a part of an effort to take down "The System." Sullivan responded "Exactly . . . I brought my megaphone to instigate that shit." *Id*. at 1:24-1:45. Sullivan also told Sacker that his motivations were "siding with anyone willing to rip this down and put something new in place, put something better in place. Pretty simple." GEX 690. And as Sullivan told Sacker later that afternoon, in private, "I probably just understood where to incite violence." GEX 901.3 at 27 minutes.

### *The Aftermath*

That night, Sullivan started to shop his video around with media outlets. During a call with a news organization, Sullivan clarified "the reason I'm out here is due to my activism, and it would be, maybe, to like get a perspective from an activist viewpoint," while Sacker identified her

19

position as "coming more from the journalist perspective, I guess, and John is more the activist." GEX 901.3 at 1:06:30-1:07:30. As his campaign to sell footage to news outlets evolved, Sullivan suddenly began relabeling himself as a journalist—even changing the caption of his website from "activist" to "journalist." GEX 1127. The reason for Sullivan's reinvention is clear: he went all in on the "good ploy" he had hatched with Sacker earlier that day in order to bury the real purpose of his presence at the Capitol—to foment anarchy.



*GEX 1127 (not admitted at trial) is a still of Sullivan's website after January 6 which had been changed to read "Video Journalist."*

### The Investigation

Even before January 6, 2021 (as described in Part V.B), Sullivan's violent take on activism had the attention of the FBI. Sullivan was quickly located after January 6, and he produced 50 minutes' worth of raw footage to the FBI at their request. About a week later, at the request of the assigned agent, Sullivan turned over eleven videos to the FBI, including the fifty-minute footage previously provided. The eleventh video (GEX 711) given to agents was only :11 seconds long.

Perhaps most importantly, Sullivan also lied to agents, telling them that he did not have a knife at the Capitol. 11/14/23 Tr. Trans. at 148.

During the execution of a search warrant, agents recovered a significant amount of video on Sullivan's devices. One of the videos located was a longer version of the :11 second video originally given to agents. The actual raw footage of this video was about 8 minutes in length and showed that when he originally gave the video to the FBI, Sullivan cut out the evidence of him berating officers for an extended period after the shooting. *See* GEX 901.14. The device extraction also yielded additional evidence of Sullivan's attempts to hide his crimes. First, Sullivan's internet searches showed he was looking to create a (fake) press pass. GEX 902.22 and 902.23. And law enforcement found an email to the Associated Press in which Sullivan again reinvented history, denying helping others at the Capitol and claiming he was just "witnessing the event unfold." GEX 902.19 (below).



*GEX 902.19: Less than a week after January 6, Sullivan falsely claims to the Associated Press that rioters "were scaling the building on their own" and that he was just there to "document[]"*

During the execution of the residence search warrant, agents found the tactical vest, mask, and clothing Sullivan wore on January 6. Agents never found the knife Sullivan brought to the Capitol.

### *Defendant's False Trial Testimony*

During trial, Sullivan elected to present a case in an elaborate effort to explain away each incriminating statement and action Sullivan made or did leading up to and including January 6, 2021. All of Sullivan's testimony doubled down on the "ploy" that he hatched at the Capitol—his repeated claim that he was and still is a journalist—to cover up his true motivation on January 6: to tear down the system. Although he had a convenient answer for every question, the

overwhelming evidence reveals Sullivan's testimonial half-truths and selective memory for what they are—a *post hoc* reinvention, and nothing more.

First, Sullivan testified broadly that he was a video journalist before January 6, 2021. *See, e.g.,* 11/14/23 Tr. Trans. at 173–176. This is false.

- Sullivan made numerous social media posts showing his anti-establishment motive through violent means (GEX 1103, 1106, 1107, 1110, 1115, 1117). Sullivan's convenient explanation for those posts as caused by "automation" (11/15/23 Tr. Trans. at 50) is contradicted by his own watermark on posts like GEX 1106 and 1420 (not admitted). Sullivan's other explanation—that that an image depicting him burning a flag was intended to be "cinematic"—is contradicted by the title, "Fuck the System-Time to Burn it All Down." *Compare* 11/15/23 Tr. Trans. at 11 and GEX 1106.

- Sullivan testified he only attended riots prior to January 6 to film. *See* 11/14/23 Tr. Trans. at 172. This is contradicted by video of him rallying a crowd in Portland (GEX 901.16), Tweets warning Portland protesters to stay away from Sullivan based on his "threats of violence," (GEX 1424.1 (not admitted)), and his own arrest at a protest in Provo (Sentencing Ex. 2, GEX 1406 (not admitted)).

- Finally, Sullivan testified that his company, Insurgence USA, LLC, was a media company. 11/15/23 Tr. Trans. at 6-7. This is false, because (a) Sullivan listed Insurgence USA as on his July 2020 LLC application a "political organization that supports the local community through peaceful protests," *see, e.g.,* 11/15/23 Tr. Trans. at 35-36, Sentencing Ex. 1[3]; (b) Sullivan used Sullivan used his website to advertise anti-government sentiments and sell gear related to protests and riots, *see* GEX 1002.3; (c) Sullivan had had an Insurgence-branded image on his device of someone throwing a Molotov cocktail. *See* GEX 901.6 (image below).

---

[3] Sentencing Ex. 1 is an excerpt from a defense exhibit not admitted at trial.



*GEX 901.6, a photo found on Sullivan's devices.*

Second, Sullivan broadly and repeatedly testified that he was acting as a video journalist

on January 6, 2021. *See, e.g.*, 11/15/23 Tr. Trans. 13-16, 24. There is not a shred of truth to this

claim. For example:

- Sullivan called for others to "show up" and counter protest on January 6, 2021.
  GEX 1104 and 1420.

- Sullivan wore all black, a ballistic vest, gas mask, and megaphone, and a brought
  a retractable tactical knife to the Capitol.

- Sullivan's own video (GX 701)—showing Sullivan loudly celebrating, inciting
  others, and leading the mob—clearly contradicts Sullivan's testimony that took
  those actions simply to "blend in" and avoid harassment. *See, e.g.,* 11/15/23 Tr.
  Trans. at 60-62.   Sullivan's only response was that the video did not depict all the
  context or that his incitement to "burn it all down" were an "inside joke." 11/15/23
  Tr. Trans. at 25 and 66–67.

- Shortly after January 6, Sullivan looked up how to create a false press pass to cover
  his tracks. GEX 902.22 and 902.23.

Third and relatedly, Sullivan lied without hesitation about key aspects of his conduct that

were flatly contradicted by the video evidence (which further show why his testimony about being

there to film was false):

- Sullivan denied helping rioters scale the Upper West Terrace, despite clear video
  evidence depicting him doing so. *Compare* 11/15/23 Tr. Trans. at 71 *and* GEX

701 at 24:41.

- Sullivan claimed he went through a broken window because the door was filled with people (11/15/23 Tr. Trans. at 73), which was contradicted by CCTV, Sacker's video, and his own video.

- Sullivan denied breaking a window in a Senate office, despite being depicted on video doing so and admitting it. *Compare* 11/15/23 Tr. Trans. at 26 *and* GEX 672.

- Sullivan claimed that police stood to the side at the Senate Carriage Door (11/15/23 Tr. Trans. at 76), which was contradicted by his own video of officers being overrun. GEX 701 at 23:19-23:40.

- Sullivan testified that he moved to the side of the Speaker's Lobby Doors to allow paramedics to give aid the injured rioter, which was disproved, again, by his own video showing him berating officers. 11/15/23 Tr. Trans. at 83; GEX 901.14.

Fourth, when confronted with some of his most incriminating statements, Sullivan falsely testified that he needed could not hear the video, had never seen the video, or needed additional context to explain his statements (Trial Tr. 11/15/23 at 89–92)—even though these same videos (GEX 688, 690) had been shown to him throughout the trial.

Fifth and finally, Sullivan falsely testified that he did not possess a knife in the Capitol. 11/15/23 Tr. Trans. at 79 ("I could have been holding anything just to make it seem more believable."). The video evidence, including Sullivan's previous video holding the knife (GEX 1002.3) and his admission that he brought a Smith & Wesson Knife to DC (11/15/23 Tr. Trans. at 48), demonstrate that this testimony was not only incredible, but false.

## C.  THE CHARGES AND CONVICTIONS

On November 10, 2021 a federal grand jury returned a second superseding indictment charging Sullivan with eight counts,[4] including Obstruction of an Official Proceeding and Aiding and Abetting, in violation 18 U.S.C. § 1512(c)(2), and 2; Civil Disorder in violation of 18 U.S.C.

---

[4] Prior to trial, Count Eight, charging a violation of 18 U.S.C. § 1001, was dismissed on the government's motion.

§ 231(a)(3), and 2; Entering and Remaining in a Restricted Building and Grounds with a dangerous weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A); Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a dangerous weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A); Unlawful Possession of a Dangerous Weapon on Capitol Grounds or Buildings, in violations of 40 U.S.C. § 5104(e)(1)(A)(i); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). On, November 16, 2023, Sullivan was convicted of those offenses following a jury trial.

## III.    STATUTORY PENALTIES

Sullivan now faces sentencing on the above seven counts.

As noted by the Presentence Report issued by the U.S. Probation Office, the defendant faces up to:

| Count | Statute | Maximum Term of Imprisonment | Maximum Supervision | Maximum Fine |
|-------|---------|------------------------------|---------------------|--------------|
| 1 | 18 U.S.C. §§ 1512(c)(2) | 20 years | 3 years | $250,000 |
| 2 | 18 U.S.C. § 231(a)(3) | 5 years | 3 years | $250,000 |
| 3 | 18 U.S.C. § 1752(a)(1) and (b)(1)(A) | 10 years | 3 years | $250,000 |
| 4 | 18 U.S.C. § 1752(a)(2) and (b)(1)(A) | 10 years | 3 years | $250,000 |
| 5 | 40 U.S.C. § 5104(e)(1)(A)(i) | 5 years | 3 years | $5,000 |
| 6 | 40 U.S.C. § 5104(e)(2)(D) | 6 months | 5 years | $5,000 |
| 7 | 40 U.S.C. § 5104(e)(2)(G) | 6 months | 5 years | $5,000 |

Counts One through Five are felonies carrying a special assessment of $100 (totaling to $500). For the Class B misdemeanors (Counts 6 and 7), there is a special assessment of $10 (totaling $20).

## IV.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

### a.  Guidelines Calculation

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The PSR originally calculated Sullivan's total offense level as 29, resulting in a Guidelines range of 87 to 108 months' imprisonment. However, between the filing of the PSR and the filing of this sentencing memo, the D.C. Circuit decided *United States v. Brock*, No. 23-3045, 2024 WL 875795 (D.C. Cir. Mar. 1, 2024). *Brock* held that the term "administration of justice," as used in U.S.S.G. § 2J1.2, does not apply to Congress' certification of electoral college votes. *See id.* at *8. Accordingly, the enhancement in U.S.S.G. § 2J1.2(b)(2), which requires a three-level enhancement "[i]f the offense resulted in substantial interference with the administration of justice" does not apply where a defendant interfered solely with the certification of electoral college votes. U.S.S.G. § 2J1.2(b)(2); *Brock*, 2024 WL 875795, at *15. This holding likely also precludes application of the eight-level enhancement in U.S.S.G. § 2J1.2(b)(1)(B), which applies if an offense "involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice," to defendants who interfered solely with Congress' certification of electoral college votes. Because the PSR applied both enhancements in calculating Sullivan's total offense level, that calculation is no longer accurate. The government submits its proposed calculation as follows:

Count One: 18 U.S.C. § 1512(c)(2)

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(3) | Extensive in Planning/Preparation | +2 |

27

| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
|---|---|---|
| | **Total** | **18** |

Count Two: 18 U.S.C. § 231(a)(1)

| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
|---|---|---|
| U.S.S.G. § 2A2.4(b)(1)(A) | Physical Contact | +3 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| | **Total** | **15** |

Count Three: 18 U.S.C. § 1752(a)(1) and (b)(1)(A)

| U.S.S.G. § 2B2.3(a) | Base Offense Level | 4 |
|---|---|---|
| U.S.S.G. § 2B2.3(b)(1)(A)(vii) | Trespass in Restricted Area | +2 |
| U.S.S.G. § 2B2.3(b)(2) | Dangerous Weapon | +2 |
| U.S.S.G. § 2B2.3(c)(1) | *(Directing Application of U.S.S.G. § 2X1.1)* | |
| U.S.S.G. § 2X1.1(a) | *(Base Offense and Specific Offense Characteristic from Count 1)* | 16 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| | **Total** | **18** |

Count Four: 18 U.S.C. § 1752(a)(2) and (b)(1)(A)

| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
|---|---|---|
| U.S.S.G. § 2A2.4(b)(1) | Dangerous Weapon | +3 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| | **Total** | **15** |

Count Five: 18 U.S.C. § 5104(e)(1)(A)(i)

| U.S.S.G. § 2K2.5 | Base Offense Level | 6 |
|---|---|---|
| U.S.S.G. § 2K2.5(c)(1) | *(Directing Application of U.S.S.G. § 2X1.1)* | |
| U.S.S.G. § 2X1.1(a) | *(Base Offense and Specific Offense Characteristic from Count 1)* | 16 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| | **Total** | **18** |

**Grouping**

Group One consists of Counts One, Three, Four and Five, because the victim of all three

counts is Congress. U.S.S.G. § 3D1.2(a), (c). The offense level for this group is 18. Group Two consists of Count Two, because the victim of that offense is the officers Sullivan interfered with at the Senate Carriage Doors. The offense level for this group is 15.

One unit is assigned to Group One. One additional unit is assigned to Group Two because it is three levels less serious than Group One. U.S.S.G. § 3D1.4(a). Because two levels are added to the group with the highest offense level, the Combined Offense level is 20. U.S.S.G. § 3D1.4.

### b. **Section 4C1.1**

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. As outlined in the sections and evidence cited above, Section 4C1.1 does not apply in this case, for two reasons. First, Sullivan "possess[ed] . . . [a] dangerous weapon . . . in connection with the offense." U.S.S.G. § 4C1.1(a)(7). As described above, Sullivan possessed a Smith & Wesson M&P tactical knife with a 3.74-inch blade, which is clearly "an instrument capable of inflicting death or serious bodily injury." U.S.S.G. § 1B1.1 cmt.n.1. And there can be little doubt that Sullivan possessed the knife "in connection with the offense"—he held it up to rioters at near the House Main Door.

Second, Sullivan clearly "use[d] violence or credible threats of violence in connection with the offense." U.S.S.G. § 4C1.1(a)(3). As described in extensive detail above: (1) Sullivan made veiled threats to officers to abandon key police lines so they would not get "hurt"; (2) Sullivan joined the mob's pushes through multiple police lines in the Northwest scaffolding, the Senate Carriage Door, and the House Main Door; (3) Sullivan made statements encouraging violence by other rioters at the House Main Doors; (4) Sullivan made statements encouraging other

rioters' violent behavior outside the Speaker's Lobby; and (5), Sullivan offered his knife up, twice, while within feet of the House floor.

Courts have rejected the application in the application of § 4C1.1 to January 6 defendants who did not specifically engage in violence but whose presence amongst volatile crowds created a credible threat to Capitol employees and officers. *See, e.g.,* Sent. Tran. 12/15/23 at 7-14, *United States v. Ronald Andrulonis*, 21-cr-85 (BAH); *United States v. Kepley*, 23-cr-162 (BAH). They have also rejected the application of § 4C1.1 to January 6 defendants who made express credible threats of violence or encouraged others to commit violence. *See, e.g.,* ECF No. 195 at 6, *United States v. Bauer*, No. 21-cr-386-2 (TNM) (holding that defendant's threats to hang Nancy Pelosi constituted a "credible threat of violence", defined as "a believable expression of an intention to use physical force to inflict harm"); ECF No. 165 at 5–6, *United States v. Williams*, 21-cr-618 (ABJ) (finding relevant that defendant organized pushes against officers). Sullivan's conduct clearly constituted a clear and credible threat to every law enforcement, member, and staff inside the Capitol, and so the Court should deny any reduction for this reason as well.

Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court were to find that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history. Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at

sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[5]

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 81. Based on the government's calculation of the defendant's total adjusted offense level at 20, Sullivan's Guidelines imprisonment range is 33-41 months' imprisonment.

### c.  Upward Departure or Variance

After determining the defendant's Guidelines range, a court then considers any departures or variances. *See* U.S.S.G. § 1B1.1(a)-(c). Following *Brock*, the enhancements under U.S.S.G. §§ 2J1.2(b)(1)(B) and (b)(2) no longer apply. But that decision does not undercut the severity of Sullivan's crime – assaulting the Capitol in an attempt to stop Congress from certifying the election. *See Brock*, 2024 WL 875795, at *15 ("interference with one stage of the electoral college vote-counting process . . . no doubt endanger[ed] our democratic processes and temporarily derail[ed] Congress's constitutional work"). In order to impose a just and fair sentence in this case, the Court should either (1) impose a nine-level upward departure pursuant to U.S.S.G. § 5K2.7, resulting in a Guidelines range of 87 to 108 months imprisonment, or (2) vary upwards to sentence Sullivan to 87 months' imprisonment, the bottom end of the pre-*Brock* Guidelines range.[6]

A "district court's authority to impose a departure emanates from 18 U.S.C. § 3553(b)(1) and, in turn, in Chapter 5, Part K of the Guidelines." *United States v. Jacobs*, 635 F.3d 778, 781–

---

[5] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

[6] As originally calculated, applying the enhancements in U.S.S.G. §§ 2J1.2(b)(1)(B) and (b)(2) to the instant case, would result in a total offense level of 29. Accordingly, the Guidelines range would have been 87-108 months' imprisonment.

82 (5th Cir. 2011). This part of the Guidelines "identifies some of the circumstances that the Commission may have not adequately taken into consideration in determining the applicable guideline range," which may warrant a departure. U.S.S.G. § 5K2.0(a)(2)(A).

One such circumstance is when an offense results in "a significant disruption of a governmental function." U.S.S.G. § 5K2.7.[7] A departure under this guideline is warranted in "unusual" circumstances where the Guidelines do not reflect the appropriate punishment for the offense. *Id*. In such circumstances, "the court may increase the sentence above the authorized guideline range to [1] reflect the nature and extent of the disruption and [2] the importance of the governmental function affected."

Although the general rule is that § 5K2.7 does not provide for an upward departure when the offense involves obstruction of justice, the obstruction of the Electoral College certification on January 6, 2021 is the exact type of unusual circumstance that the Sentencing Commission could not have predicted and that warrants an upward departure. Those who obstructed the administration of justice that day targeted the peaceful transfer of power, one of the fundamental and foundational principles of our democracy. They were part of a mob that injured more than one hundred police officers and resulted in more than 2.9 million dollars in losses. Defendants like Sullivan "endanger[ed] our democratic processes and temporarily derail[ed] Congress's constitutional work." *Brock*, 2024 WL 875795, at *15. It was an unprecedented day in American history. But, following *Brock*, the seriousness of the crimes committed for defendants like Sullivan is not adequately captured by the applicable Guideline, § 2J1.2, because the Sentencing

---

[7] This guideline does not require the government to establish a direct link between the defendant's misconduct and the alleged disruption, nor does it "require that the disruption be of any particular type or consequence." *See United States v. Saani*, 650 F.3d 761, 765–66, 771 (D.C. Cir. 2011).

Commission did not contemplate that an event like January 6 could happen when it wrote the Guidelines. At least one Judge of this Court has already applied § 5K2.7 in a January 6 case. *See United States v. Eicher*, 22-cr-38 (BAH), Sent. Tr. 9/15/23 at 50 (applying § 5K2.7 because the defendant "join[ed] a mob, in the center of the melee, and through the sheer numbers and aggressive conduct towards police, breached the Capitol resulting in stopping the legitimate business of Congress for hours"). In these highly unusual circumstances, a nine-level upward departure under § 5K2.7 is appropriate to reach the same offense level that would have applied to Sullivan if the § 2J1.2 enhancements applied.[8]

If the Court decides not to apply § 5K2.7, an upward variance is warranted to achieve an appropriate sentence under the § 3553(a) sentencing factors. An upward variance is appropriate when "the defendant's conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range." *United States v. Murray*, 897 F.3d 298, 308–09 (D.C. Cir. 2018) (cleaned up).

Here, an upward variance is warranted to account for the unique nature and circumstances of the offense and to reflect the seriousness of the offense. As just discussed, Sullivan's obstruction of justice on January 6 was a serious offense that attacked the fundamentals of American democracy. The only reason that Sullivan is not subject to eleven levels' worth of enhancements in § 2J1.2 is because the Sentencing Commission did not imagine that a day like January 6 could occur. As Judge McFadden stated in a pre-*Brock* sentencing hearing:

> Regardless of whether the 'administration of justice' language actually applies to this situation, *I have no doubt that the Commission would have intended for this to apply to*

---

[8] While the government's past practice has been not seek to apply § 5K2.7 in January 6 cases; post-*Brock*, the sentencing guidelines for violating 18 U.S.C. § 1512(c)(2) do not reflect an appropriate punishment in January 6 cases.

*substantial interference with an official proceeding like a certification process, which is itself more significant than almost any court proceeding…* [Y]ou and your fellow rioters were responsible for substantially interfering with the certification, causing a multiple-hour delay, numerous law enforcement injuries and the expenditure of extensive resources.

*United States v. Hale-Cusanelli*, 21-cr-37 (TNM), Sent'g Tr. 9/22/22 at 86-87 (emphasis added).

In the specific facts and circumstances of Sullivan's case (discussed in more detail below), an upward variance is appropriate to at least the bottom of the Guidelines range if U.S.S.G. §§ 2J1.2(b)(1)(B) and (b)(2) had applied – 87 months' incarceration. *See United States v. Reffitt,* 21-cr-87 (DLF), Mem. Op. and Order 4/10/24 at 10-11 (upward variance would be justified because "as other judges in this district have noted, the proceedings at issue on January 6, 2021 were of much greater significance than run-of-the-mill 'judicial, quasi-judicial, and adjunct investigative proceedings'"); *United States v. Fonticoba*, 21-cr-368 (TJK), Sent'g Tr. 1/11/24 at 66–67 (stating that, even if the defendant's § 1512 conviction were invalidated, a significant upward variance was warranted to account for the defendant's intent "to obstruct the proceeding and the nature of the proceeding itself"); *Fonticoba*, 4/11/2024 Mem. Order at 4-5 (denying motion for release pending appeal and agreeing that certification proceeding was "far more important" than "any run-of-the-mill" judicial or quasi-judicial proceeding). Accordingly, the government requests that the Court vary upwards and sentence Sullivan to 87 months' imprisonment, in order to give effect to "the concerns underlying the Government's requests for these enhancements under the § 3553(a) factors at sentencing."   *See United States v. Seefried*, 639 F. Supp. 3d 8, 20 (D.D.C. 2022).

## V.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.      Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Sullivan's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. After months of advocating against the establishment, January 6 presented Sullivan with the unique opportunity to put action behind his words. And although Sullivan worked with unlikely allies who had different political orientations, they all shared the same end goal on January 6: stop the certification. Sullivan almost achieved that goal as he incited violence, rallied others, and charged his way deep into the heart of the Capitol, coming within feet of the House Chamber. When rioters clamored to break down the door, Sullivan offered up a deadly weapon—his tactical knife—to assist in their efforts. At the Speaker's Lobby Door, Sullivan verbally offered up his knife and encouraged other rioters to smash the Speaker's Lobby windows—yet had the audacity to confront officers with disgust over the decision to protect unarmed employees of the Capitol from the raging mob. After January 6, Sullivan bragged about his conduct to friends and reiterated his motives to his documentarian. However, when the significance of the events that day began to dawn on him, Sullivan doubled down on the "ploy" he had hatched at the Capitol, trying to control the changing narrative against him. He held himself out to be a journalist and provided select video to the FBI. But when looking at each puzzle piece in place, it is clear Sullivan meant every word and action from January 6 and relished the opportunity to "burn it all down." The nature and circumstances of Sullivan's offenses were of the utmost seriousness, and fully support an upward variance and the government's recommended sentence of 87 months.

### B.  The History and Characteristics of the Defendant

Although Sullivan has a criminal history category of I, he is no stranger to the criminal justice system. Sullivan's history underscores how serious he is about achieving his goals by destructive means. On June 29, 2020, Sullivan helped host a protest against police brutality in Provo, Utah. *See* Sent. Ex. 2. The protest went from peaceful to violent as protesters began blocking traffic, which led to confrontation as motorists tried to pass protestors. Sullivan recorded himself encouraging protestors to confront and kick cars, even kicking a car himself saying "fuck your head up." GEX 1425 (not admitted at trial) at 1:30-1:50. Prior to the kick Sullivan said "Imma beat your ass, bitch." Id. at 1:39. During the protest, a driver was shot, leading to the arrest of the shooter and others, including Sullivan. Sullivan reportedly admitted to knowing who the shooter was but initially failed to disclose the identity to law enforcement. GEX 1406 (not admitted at trial) at 2. Sullivan's misdemeanor case was eventually dismissed due to a bar by the statute of limitations.

At trial, Agent M.F. testified that Sullivan first came across the FBI's radar in September 2020. This was because Sullivan was under investigation for vandalism of a federal building in Los Angeles. It was believed that Sullivan was a part of a 15–20-person group who spray painted anti-government sayings on a federal building. Sullivan was not charged for this incident.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Sullivan's criminal conduct on January 6 was the epitome of disrespect for the law. Sullivan has even disregarded the court's directions: Sullivan was directed not to use social media as a condition of his pre-trial release, which Sullivan acknowledged to a journalist during a

February 2021 interview. Afterwards, Sullivan followed the journalist on Twitter via an older account @ActivistJayden. While reviewing the account, the journalist noted a retweet that read "Let's make 2021 the year of political upheaval," to which Sullivan responded from one of his other accounts "I'm fucking ready." GEX 1405 (not admitted at trial) at 8.

### D.  The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[9] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. First, although Sullivan has a criminal history category of I, his history of arrests and his participation in riots shows a concerning pattern of using extreme measures to provoke the chaos and societal unrest he desires. Second, Sullivan has expressed no remorse and has yet to give even a hint of accountability. When confronted with the massive amount of evidence against him, Sullivan continuously thumbed his nose, making up lie after lie in an attempt to distance himself from his own actions and words. Sullivan's Janus-faced willingness to throw up the shield of journalism to escape accountability, while in private telling cronies of his "ploy" as he sought to "tear it all down," mocks and denigrates the principles

---

[9]  *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

of a free press. The lengths Sullivan has gone through to convince the media, federal agents, a jury of his peers, this Court, and perhaps even himself, that his actions were not dangerous are in and of itself dangerous. Sullivan is clearly in need of specific deterrence. To date, there is no indication that Sullivan will ever take responsibility for his actions.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted

disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[10]

---

[10] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[11] While no previously sentenced case contains the same unique facts as Sullivan or the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

Defendant Christopher Grider was standing near Sullivan while at the Speaker's Lobby. In *United States v. Grider*, 21-cr-22-CKK, Grider picked up a black helmet discarded on the Upper West Terrace before entering the Capitol. Much like Sullivan, Grider ran with the crowd from the Main House Entrance to the Speaker's Lobby Doors. At the Lobby, Grider gave the black helmet to another man, Zachary Alam,[12] who then used the helmet to smash out the windows at Sullivan's gleeful encouragement ("Go! Go! Let's go! Get that shit"). Grider was found guilty of violations of 18 U.S.C. § 1512(c)(2), 18 U.S.C. § 231(a)(3), and 18 U.S.C. § 1361, among others.[13] The Court in *Grider* imposed a sentence of 83 months of incarceration followed by 36 months of supervised release. Unlike Grider, Sullivan was also convicted of bring a dangerous and deadly weapon on Capitol grounds—his tactical knife—which Sullivan offered up to the crowd twice. An 87-month sentence appropriately recognizes that Sullivan's conduct is similar but ultimately more culpable than Grider's.

---

[11] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

[12] Alam is scheduled to be sentenced on May 6, 2024. 21-cr-90 (DLF).

[13] Grider was found guilty of the felony violation of 18 U.S.C. § 1361.

Defendant Guy Reffitt—a member of the Texas Three Percenter militia—wore body armor and brought a pistol and flexi-cuffs to the Capitol, to follow up on his stated plan to violently drag legislators from the building. Though he never made it inside, Reffitt led the mob in charging police on the West side stairs, clearing the way for the breach of the Capitol. Reffitt was convicted at trial of 18 U.S.C. § 231(a)(2), 18 U.S.C. § 1512(c)(2), 18 U.S.C. 1752(a)(1) and (b)(1)(A), 18 U.S.C. § 231(a)(3), and 18 U.S.C. § 1512(a)(2)(C), based on a subsequent threat. Judge Friedrich determined the total offense level as 29 and sentenced Reffitt to 87 months, the bottom of the Guidelines range. Like Reffitt, Sullivan engaged in pre-planning—wearing a tactical vest and bringing a gas mask, megaphone, and a knife—though Reffitt's stated intent was clearer and violently-laced, and his decision to bring a firearm much more concerning. But unlike Reffitt, Sullivan actually entered the Capitol Building, incited rioters at every major breach inside, and offered up his own deadly weapon at two crucial junctures—either of which could have led to more officers or rioters killed. While the two men have vastly disparate worldviews, both shared a desire to see the government burn and had no remorse for their actions. Sullivan deserves an equivalent sentence, varied upwards to 87 months—the bottom of the pre-*Brock* guidelines—his based on his egregious and aggressive conduct that culminated at the Speaker's Lobby Doors.

## VI.    FINE

The government seeks a $90,875 in this case, the amount of the proceeds Sullivan received from selling his January 6 videos.[14] Sullivan's convictions under Counts One through Five subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b)(3). In determining whether

---

[14] The Government alleged forfeiture of this amount. The Court should stay any release of the funds pending Sullivan's full satisfaction of the fine amount.

to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public." *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994). The government's investigation revealed that Sullivan netted $89,875 in a personal bank account ending in -7715 and $1,000 in a Venmo account tied to Insurgence USA. ECF No. 29 at 9. The government seized those funds pursuant to warrants. ECF No. 29 at 1. Sullivan previously submitted invoices as exhibits ahead of his pretrial release conditions hearing. ECF No. 13 at 6 and ECF No. 14. Additionally, the government submits exhibits 3-8 [15] which detail the amount of money he received for each agreement. In total, Sullivan has made $90,875 by selling his footage. Sullivan should not be able to "capitalize" on his participation in the Capitol breach and should be fined the entire amount of his proceeds.

## VII.  RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with

---

[15] Sentencing exhibits 3-8 are a combination of invoices, contracts, and an excerpt from Sullivan's bank account all memorializing the payments received.

discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Sullivan was convicted of a violation of an offense under Title 18, and the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both the VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take

account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[16]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.*

More specifically, the Court should require Sullivan to pay $2,000 in restitution for his convictions on Counts One and Two. This amount fairly reflects Sullivan's role in the offense and the damages resulting from his conduct (smashing the window-albeit an accident). Moreover, in

---

[16] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process.  *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose an upward variance and sentence Sullivan to 87 months of incarceration, 3 years supervised release, a fine in the amount of $90,875, $2,000 in restitution, and the mandatory assessment of $500 (for each felony conviction) and $20 (for each Class B Misdemeanor).

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:   */s/ REBEKAH LEDERER*
REBEKAH LEDERER
Pennsylvania Bar No. 320922
Assistant United States Attorney
U.S Attorney's Office for District of
Columbia
601 D St. N.W, Washington, DC 20530
(202) 252-7012
Rebekah.Lederer@usdoj.gov

*/s/ MICHAEL BARCLAY*
MICHAEL L. BARCLAY
Assistant United States Attorney
N.Y. Bar Reg. No. 5441423
U.S. Attorney's Office for the District of
Columbia
601 D Street, NW Washington, D.C. 20001
(202) 252-7669
Michael.Barclay@usdoj.gov

45