UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.

JOHN EARLE SULLIVAN,

    *Defendant.*

Case No. 1:21-cr-78-RCL

## MEMORANDUM OPINION

As part of his sentence for his role in the Capitol Riots of January 6, 2021, defendant John Earle Sullivan forfeited $62,813.76 that he accrued by selling footage of that day's events. While his conviction was pending appeal before the D.C. Circuit, Mr. Sullivan received a Presidential pardon, and his convictions were subsequently vacated. He now seeks to recover these forfeited funds, which are being held in a deposit account in the United States Treasury.

Then-interim U.S. Attorney for the District of Columbia Edward Martin agreed that Mr. Sullivan is entitled to the return of these funds, and maintained that the Government possesses the authority to disburse them. However, the Appropriations Clause of the Constitution forbids doing so. For the reasons that follow, the Court will **DENY** Mr. Sullivan's Motion and **ORDER** the Government not to disburse his funds absent a duly enacted Congressional appropriation.

**I.   BACKGROUND**

Defendant John Earle Sullivan participated in the Capitol Riots of January 6, 2021. His motives for participating in the riots were, to put it gently, idiosyncratic. As the Court found from the evidence adduced at trial and recounted at his sentencing, Mr. Sullivan was unlike many other rioters insofar as he was not motivated by a belief that the 2020 Presidential election was rigged or stolen: "Some [January 6 defendants] started out with innocent intentions but got swept up in the moment. Others sought to use violence to achieve specific political ends. But for Mr. Sullivan,

violence was an end [un]to itself." Sent. Tr. at 31:16–19, ECF No. 158.  For instance, when some other rioters encouraged the mob to act peacefully, he loudly shot down their suggestion and encouraged the use of violence instead, and repeatedly let other rioters know that he had brought a knife with him.  *Id.* at 32:21–33:7; *see also* Trial Tr. Nov. 13, 2023, at 39:10, ECF No. 135.

Mr. Sullivan callously used the riots as an opportunity for personal profit, manipulating other rioters for his own gain.  Under the pretense of "journalism," he recorded the day's events, intending to sell the footage for profit.  At one point during the day, another rioter captured Mr. Sullivan on camera speaking with surprisingly candid disdain for the other rioters: "I brought my megaphone to instigate shit . . . I'm gonna make these Trump supporters f— all this shit up . . . Trust me when I say my footage is worth like . . . millions of dollars."  Opp'n to Mot. for Release of Funds 8, ECF No. 29[1]; *see also* Trial Tr. Nov. 14, 2023, at 29:24 (Mr. Sullivan "called around to shop the footage to various media outlets" and "wanted to sell" it).

Mr. Sullivan cynically and falsely portrayed himself as a journalist not only to legitimize his cruel profiteering—at the expense of the police, his fellow rioters, and his country—but also in hopes of evading legal accountability for his actions.  Indeed, he all but admitted his intended ploy in a video that he took the day before the Riots: "I think I made up, uh—what did I say I was? Oh yeah, I was just a journalist, but I use that all the time."  Opp'n to Mot. for Release of Funds at 8[1]; *see also* Trial Tr. Nov. 15, 2023, at 47:21 (discussing a video recording in which Mr. Sullivan stated that he did not consider himself a journalist).  He later remarked that he attended the Capitol Riots posing as a journalist so that, in his own words, "I don't get arrested."  Sent'g Tr. at 33:16; *see also* Trial Tr. Nov. 15, 2023, at 93:4, ECF No. 138.

---

[1] These quotations, and one on the following page, derive from the Government's opposition to Mr. Sullivan's Motion for Release of Funds, which he filed in May of 2021.  *See* Mot. for Release of Funds, ECF No. 25.  Mr. Sullivan's reply brief in support of that motion does not dispute these quotations' veracity or their attribution to him, so the Court considers their accuracy to be conceded.  *See generally* Reply in Support of Mot. for Release of Funds, ECF No. 31.

Most notably, in footage that the Court has seen, Mr. Sullivan at one point encouraged rioters to break down the Speaker's Lobby doors. Eventually, the rioters broke a glass pane in one of those doors. Spurred on by Mr. Sullivan incitements, and despite the warnings of the police, a rioter named Ashli Babbitt began climbing through the pane with a folding knife in her pocket. Perceiving an imminent threat to the lawmakers and staff inside, a Capitol Police officer shot and killed her. Mr. Sullivan captured the entire horrific incident on video, and later sold this and other footage for a tidy sum of over $90,000. Sent'g Tr. at 33:8–16; *see* Forfeiture Allegation, Superseding Indictment at 5, ECF No. 56. Mr. Sullivan was perfectly content to see his fellow rioters get arrested, beaten, or worse, so long as he escaped unscathed and with cash lining his pockets. In a recording by another individual, Mr. Sullivan is heard celebrating that he had captured Ms. Babbitt's death, proclaiming: "Everybody's gonna want this [footage]. Nobody has it. I'm selling it, I could make millions of dollars." Opp'n to Mot. for Release of Funds at 8.

On April 29, 2021, pursuant to two warrants issued by a magistrate judge, the Government seized $62,813.76 from Mr. Sullivan's bank account attributable to his sale of the Capitol Riots footage. *See* Def.'s Mot. for Release of Funds 2, ECF No. 25; Opp'n to Mot. for Release of Funds at 10. On November 16, 2023, a jury convicted Mr. Sullivan on all counts of a seven-count indictment. Verdict Form, ECF No. 126. On April 26, 2024, this Court delivered Mr. Sullivan's sentence, which included the forfeiture of the ill-gotten proceeds taken from his bank account and Venmo wallet. *See* Judgment at 8, ECF No. 153. Mr. Sullivan appealed, and while that appeal was pending, he received a Presidential pardon. Proclamation No. 10887, 90 Fed. Reg. 8331 (Jan. 20, 2025). As a result, the D.C. Circuit vacated this Court's judgment and remanded with instructions to dismiss the case as moot, which this Court subsequently did. *See* U.S. Court of Appeals Order of February 27, 2025, ECF No. 163-1; Order of March 4, 2025, ECF No. 164.

On March 15, 2025, Mr. Sullivan filed a motion for the return of his forfeited assets. *See* Mot. for Return of All Assets Seized During Arrest, ECF No. 165. On April 11, 2025, the Government responded to Mr. Sullivan's Motion, indicating that it did not oppose the relief that Mr. Sullivan sought and intended to remit the forfeited funds back to him. *See* Gov's Resp. 2, ECF No. 168. The Court, however, registered its belief—further explored and confirmed in this Opinion—that funds may not be drawn from the United States Treasury without a Congressional appropriation, even in the event of a pardon. *See* Order of April 12, 2025, at 2, ECF No. 169. The Court therefore ordered the Government to refrain from disbursing the forfeited funds pending further order of the Court, and also ordered the Government to file a supplemental notice about the location and custody of the funds taken from Mr. Sullivan's bank and Venmo accounts. *Id.* at 3. On April 15, 2025, the Government filed its supplemental notice, revealing that the forfeited funds have been stored since December 27, 2023 in the United States Marshals Service's Seized Asset Deposit Fund ("SADF"), a deposit account in the United States Treasury. *See* Gov's Suppl. Notice 2, ECF No. 170. The Government continues to maintain, however, that the Court may— indeed, must—authorize the return of those assets to Mr. Sullivan.

## II. *KNOTE v. UNITED STATES* DICTATES THAT MR. SULLIVAN'S FUNDS CANNOT BE RETURNED WITHOUT A CONGRESSIONAL APPROPRIATION.

There are two candidates for which Supreme Court case controls the outcome of this proceeding: *Knote v. United States*, 95 U.S. (5 Otto) 149 (1877), and *Nelson v. Colorado*, 581 U.S. 128 (2017). The Government urges that the latter controls. The Court disagrees.

*Knote* concerned a supporter of the Confederacy whose property in West Virginia had been confiscated in connection with charges of treason and rebellion levied against him. *Knote*, 95 U.S. at 149. A federal court ordered that this property be sold, yielding proceeds of $11,000, which were paid into the United States Treasury. *Id.* at 149, 152. After receiving a pardon from President

4

Johnson, the litigant argued that he was entitled to the proceeds from the sale of his condemned property. *Id.* at 150. The Supreme Court ruled against him, holding that a pardon does not

> affect any rights which have vested in others directly by the execution of the judgment for the offence, or which have been acquired by others whilst that judgment was in force. . . . [I]f the proceeds have been paid into the treasury, the right to them has so far become vested in the United States that they can only be secured to the former owner of the property through an act of Congress. Moneys once in the treasury can only be withdrawn by an appropriation by law. However large, therefore, may be the power of pardon possessed by the President, and however extended may be its application, there is this limit to it, as there is to all his powers,— *it cannot touch moneys in the treasury of the United States, except expressly authorized by act of Congress*. . . . Where, however, property condemned, or its proceeds, have not thus vested, but remain under control of the Executive, or of officers subject to his orders, or are in the custody of the judicial tribunals, the property will be restored or its proceeds delivered to the original owner, upon his full pardon. The property and the proceeds are not considered as so absolutely vesting in third parties or in the United States as to be unaffected by the pardon until they have passed out of the jurisdiction of the officer or tribunal.

*Id.* at 149, 154 (emphasis added). Though *Knote* is now nearly 150 years old, the Supreme Court reaffirmed the validity of this holding in more recent years. *See, e.g.*, *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 425–26 (1990) (quoting *Knote* and noting that "the pardon power cannot override the command of the Appropriations Clause"). The Court of Appeals for the D.C. Circuit has applied *Knote* as recently as 1994. *See In re North*, 62 F.3d 1434, 1435–36 (D.C. Cir. 1994) (Sentelle, J.) (holding that "the Constitution [and] *Knote* . . . forbid" the court from "authoriz[ing] payment from the Treasury" to a pardon recipient without "congressional authorization"). And other Circuit Courts of Appeals have continued to apply it within the last couple of years. *See, e.g.*, *Boultbee v. United States*, No. 2024-2260, 2025 WL 1077679, at *2 (Fed. Cir. Apr. 10, 2025) ("Pardons . . . cannot restore money transferred to the U.S. Treasury, 'except expressly authorized by act of Congress.'") (quoting *Knote*, 95 U.S. at 154); *CFPB v. Law Offs. of Crystal Moroney*,

5

*P.C.*, 63 F.4th 174, 182 (2d Cir. 2023) (citing *Knote* for the proposition that payments from the Treasury require statutory authorization); *Fordham v. Ga. Dep't of Admin. Servs.*, No. 23-11214, 2023 WL 5747709, at *2 (11th Cir. Sept. 6, 2023) ("Though a pardon 'releases the offender from the consequences of his offence,' including asset forfeiture," nevertheless "a pardon does not affect any property rights 'vested in others directly by the execution of the judgment for the offence, or which have been acquired by others whilst that judgment was in force'") (first quoting *Osborn v. United States*, 91 U.S. 474, 477 (1875), and then quoting *Knote*, 95 U.S. at 154).[2]

*Nelson*, the more recent case on which the Government relies, arose under very different circumstances. The named petitioner in that case was convicted by jury in a Colorado state court of physically and sexually abusing her children, and was ordered to pay over $8,000 in costs, fees, and restitution in addition to her prison sentence. *Nelson*, 581 U.S. at 131. Her conviction was reversed due to a trial error, and she was acquitted upon retrial. *Id.* The other petitioner in that case was convicted of attempting to patronize a child prostitute and attempted sexual assault. *Id.* He, too, was ordered to pay over $4,000 in costs, fees, and restitution. *Id.* One of his convictions was reversed by the Colorado Supreme Court on appeal, whereas the other was vacated by a Colorado state postconviction court. *Id.* Both petitioners moved for a return of the funds that they had thus far paid due to their erstwhile convictions. *Id.* at 132. However, the courts of Colorado denied their requests because a Colorado statute, the Exoneration Act, required a petitioner to prove his or her actual innocence by clear and convincing evidence before such assets could be recouped. *Id.* at 133–34. The United States Supreme Court determined that the Exoneration Act's reimbursement scheme was incompatible with the Due Process Clause of the Fourteenth

---

[2] For examples of other Circuit Courts of Appeals that have recently relied on *Knote*, though somewhat less recently than the ones cited above, see, e.g., *Flick v. Liberty Mut. Fire Ins. Co.*, 205 F.3d 386, 391 (9th Cir. 2000), and *PA Prison Soc'y v. Cortes*, 622 F.3d 215, 243 (3d Cir. 2010). *See also Yasak v. Ret. Bd. of Policemen's Annuity and Benefit Fund of Chi.*, 357 F.3d 677, 683–84 (7th Cir. 2004) (Ripple, J., dissenting).

Amendment, in part because "an invalid conviction is no conviction at all," and thus Colorado had no cognizable interest in "withholding from [the petitioners] money to which the State currently has zero claim of right." *Id.* at 136 n.10, 139 (quotation omitted). The Court concluded that "[t]o comport with due process, a State may not impose anything more than minimal procedures on the refund of exactions dependent upon a conviction subsequently invalidated." *Id.* at 139.

The Government contends that *Nelson* controls because "[Mr.] Sullivan's convictions," like those in *Nelson* but unlike that in *Knote*, "were not yet final" at the time of his pardon, and were "vacated on direct appeal." Gov's Resp. at 2. At least one court has seemingly endorsed this argument. *See Boultbee v. United States*, No. 23-1884, 2024 WL 3220261, at *4 (Fed. Cl. June 27, 2024) (distinguishing *Nelson* from *Knote* on the basis that "*Nelson* involved individuals whose convictions were invalidated on appellate review, not pardons."), *aff'd*, 2025 WL 1077679 (Fed. Cir. Apr. 10, 2024).[3]

Respectfully, although the Government and the Court of Federal Claims have correctly identified *a* difference between *Knote* and *Nelson*, they have both misdiagnosed the real operative difference between them.[4] *Nelson*, at bottom, is a case about the Due Process Clause of the Fourteenth Amendment and its supremacy over contradictory state law. At a high level of abstraction, it stands for the proposition that the several states may not erect procedural barriers that violate the federal Constitution's guarantee of due process. Accordingly, a state may not require a person whose presumption of innocence has been restored by the vacatur of his

---

[3] Although the Court of Appeals for the Federal Circuit affirmed this opinion of the Court of Federal Claims, it bears mention that the Federal Circuit's opinion did not mention *Nelson*, much less address the *Knote* / *Nelson* distinction.

[4] It bears mention as well that the D.C. Circuit has applied *Knote* in a case where the defendant's conviction was not yet final at the time of his pardon. *See In re North*, 62 F.3d at 1435 (pardon issued "after the jury verdict but before judgment of conviction was entered"). *In re North* preceded *Nelson* by more than thirty years, but at least one other federal court has approvingly cited *Knote*'s Appropriations Clause holding in the few years since *Nelson*. *See United States v. Carter*, No. 16-200032-02-JAR, 2020 WL 430739, at *3 n.12 (D. Kan. Jan. 28, 2020) (Robinson, C.J.). The Court is aware of no authority for the proposition that *Nelson* partially abrogated or otherwise narrowed *Knote*.

conviction(s) to *prove* his innocence in order to recoup his forfeited property. The facts of *Nelson*, of course, did not implicate the federal Constitution's Appropriations Clause in any way whatsoever, because none of the petitioners' disputed funds were held in the federal Treasury.

*Knote*, on the other hand, is not about due process; indeed, neither the word "due" nor "process" appears even once in the opinion. And that stands to reason: Unlike Colorado had done with its Exoneration Act, the federal government in *Knote* did not enact any procedural obstacles or evidentiary hurdles whatsoever to the disbursement of *Knote*'s proceeds. The only obstacle to repayment was the Appropriations Clause itself which, according to *Knote*, demands that funds may not leave the Treasury absent an appropriation.[5]

The instant case is materially identical to *Knote*. Mr. Sullivan's forfeited funds "passed out of the jurisdiction of the officer" (that is, the FBI) and the "tribunal" (that is, the Court) on December 7, 2023, when the FBI released them by cashier's check to the Marshals Service's SADF account, Gov's Suppl. Notice at 1, and "vested in the United States" with their deposit into the Treasury. *Knote*, 95 U.S. at 154. That being so, and contrary to the Government's position, it is irrelevant whether Mr. Sullivan's convictions were vitiated by pardon, vacatur on appeal, collateral attack, retroactive Congressional enactment, or any other means. All that matters is that funds may not be drawn from the Treasury without an appropriation, plain and simple. *See Republic Nat'l Bank of Miami v. United States*, 506 U.S. 80, 94 (1992) (Rehnquist, C.J.) ("[T]he principle that once funds are deposited into the Treasury, they become public money—and thus may only be paid out pursuant to a statutory appropriation—would seem to transcend the facts of *Knote*.")

---

[5] Neither the Government nor Mr. Sullivan has gone so far as to argue that the Appropriations Clause *itself* violates the Fourteenth Amendment's Due Process Clause as applied to the facts of this case. But suppose, hypothetically, that the *federal* government enacted an appropriation statute allowing for the refund of forfeited property held in the Treasury, but only if the defendant could prove his actual innocence by clear and convincing evidence. Such a case might fall somewhere between *Knote* and *Nelson*, and might raise thorny questions about the interaction between the Due Process Clause of the Fifth Amendment and the Appropriations Clause–questions which are not presented herein.

8

The Government gestures to two cases in which the First and Fourth Circuits, relying on *Nelson*, held that special assessments, restitution, and forfeiture orders must be vacated if the defendant's conviction is abated due to death pending appeal. *See United States v. Reynolds*, 98 F.4th 62, 72 (1st Cir. 2024); *United States v. Ajrawat*, 738 Fed. App'x 136, 139 (4th Cir. 2018) ("When the underlying conviction is invalidated—regardless of the reason—there is no longer any basis justifying the government's retaining funds exacted only as a result of that conviction."). The Court is aware of a handful of other cases reaching the same conclusion. *See, e.g.*, *United States v. Brooks*, 872 F.3d 78, 89 (2d Cir. 2017); *United States v. Libous*, 858 F.3d 64, 67 (2d Cir. 2017) ("[I]n our system of criminal justice, the state is not permitted to charge the accused for the privilege of having been prosecuted."); *United States v. Coddington*, 802 Fed. App'x 373, 375 (10th Cir. 2020). These cases, however, are inapposite. Not a single one of these cases confronts the Appropriations Clause implications of its decision: none of them discusses *Knote* or its progeny in any capacity, nor do any of them so much as mention whether the disputed funds were held in the United States Treasury.[6] Unlike in the case at hand, these issues were evidently not presented.

At the very most, these abatement cases stand for the proposition that the financial penalties associated with a conviction must disappear as a formal matter when the underlying conviction disappears. Even assuming that this principle is correct, it means only that, in the abstract, Mr. Sullivan is entitled to his forfeited funds as a matter of *right*. But Mr. Sullivan's motion raises a wholly distinct question, not of *right*, but of *remedy*: Assuming for sake of argument that Mr. Sullivan is entitled to funds currently held in the Treasury, can this Court authorize the return of

---

[6] *Reynolds* comes closest to confronting the issues raised by *Knote*. After concluding that the defendant's financial penalties should be abated, the Court noted that it took "no position on whether the different considerations that might arise where forfeited property had been distributed to victims before a defendant's death would call for a different result . . . ." *Reynolds*, 98 F.4th at 72. In this Court's view, *Knote* furnishes the answer to this unexplored question: Funds exacted pursuant to a now-vacated conviction may not be returned to the defendant once the rights therein have vested in *either* a third party *or* the Treasury, drawing no distinction between the two. 149 U.S. at 154.

9

those funds without a Congressional appropriation? Alternatively, can the Government draw those funds from the Treasury without such an appropriation? The answer in both cases is a resounding "no": the Appropriations Clause, as interpreted in *Knote*, plainly forbids either course of action.

### III. MR. SULLIVAN'S FORFEITED FUNDS ARE SUBJECT TO THE APPROPRIATIONS CLAUSE

#### A. The Court Will Not Recognize an Exemption for Non- or Quasi-Public Money

The Government next urges that, even if the *Knote* framework applies, the funds are nevertheless disbursable without a Congressional appropriation because they remain "practically speaking" in the custody of the U.S. Marshals Service. Gov's Resp. at 3. The Government cites DOJ forfeiture regulations stating that "[a]ll property seized for forfeiture by . . . [the] FBI shall be delivered to the *custody* of the U.S. Marshals Service (USMS)," including such currency as may be deposited "in the seized Asset Deposit Fund pending forfeiture . . . ." 28 C.F.R. § 8.5(a), (b) (emphasis added). The Government further points to a DOJ webpage which states that "Funds in the SADF are not the property of the Federal government . . . ." Dep't of Just., Asset Forfeiture Management Staff, https://www.justice.gov/jmd/afms [https://perma.cc/XN4Q-QEFY]. And the Government adds that funds in the SADF, unlike those held in the DOJ's Assets Forfeiture Fund, are not ordinarily obligated to fund routine DOJ activities. Gov's Resp. at 4 n.2.

The Court rejects this invitation to endorse a legal fiction whereby some funds that are indisputably in the Treasury are considered not to be so for Appropriations Clause purposes. The Appropriations Clause, and the coupled Statement and Account Clause, read together as follows:

> "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law; and a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time."

U.S. Const. art. I, § 9, cl. 7. The Appropriations Clause's language contains no qualifications: It says "*No* Money," not "No Money that is the property of the Federal Government" or "No Money,

10

except that owing to a not-yet-final conviction." Moreover, the Statement and Account Clause refers to "public Money," but the Appropriations Clause refers only to "Money." This difference suggests that, even *if* the Framers contemplated some distinction between funds belonging to the United States and monies that are "practically speaking" in the custody of another entity (and thus not "public"), such a distinction is irrelevant for Appropriations Clause purposes. Indeed, a six-Justice majority of the Supreme Court, confronted with a similar suggestion, expressed "difficulty accepting the proposition that funds which have been deposited into the Treasury are not public money, regardless of whether the Government's ownership of those funds is disputed." *Republic Nat'l Bank*, 506 U.S. at 93 (Rehnquist, C.J.).[7] Absent a persuasive textual justification, this Court will not embrace a novel Appropriations Clause theory that the Supreme Court has all but shunned.

Money is money, the Treasury is the Treasury, and the Constitution says what it says: Once money is in the Treasury, it can only be withdrawn pursuant to a Congressional appropriation. The fact that the DOJ says that certain funds in the Treasury are not the property of the United States, and therefore not subject to the strictures of the Appropriations Clause, does not make it so.[8, 9]

---

[7] Furthermore, it strikes the Court as significant that Justice Blackmun's separate opinion in *Republic National Bank* received the assent of eight Justices, *except for* the portion in which he theorized that "funds held in the Treasury during the course of an ongoing *in rem* forfeiture proceeding" could *not* "properly be considered public money," which received the support of only three. *Id.* at 91–92.

[8] The Court is aware that under certain circumstances funds have been informally withdrawn from the Treasury, as in the case of "overpayment of federal income taxes" which some posit may be "refunded without appropriation," or "funds held by the United States in escrow or in other trust arrangements in the course of litigation." Kate Stith, *Congress' Power of the Purse*, 97 Yale L.J. 1343, 1358 & n.67 (1988). The legality of these withdrawals is not before the Court. Perhaps some of these run-of-the-mill withdrawals are covered by an appropriation statute. *See, e.g.*, *id.* (noting that "Congress has enacted a permanent appropriation for refund of amounts erroneously deposited to the Government," but arguing that such withdrawals could legally take place even if Congress had not enacted that statute). Or perhaps those withdrawals which are not covered by an appropriation statute are actually unlawful. That issue is not before the Court, so the Court expresses no opinion on it; it suffices to say that the return of forfeited funds stored in the Treasury requires an appropriation. Lest the Court be accused of embracing a fringe theory of the Appropriations Clause, it bears mention that this holding is consistent with the understanding of this Court's Finance Office and official guidance from the Office of General Counsel for the Administrative Office of the U.S. Courts. *See* Notice of Suppl. Ex. at 3, *United States v. Vargas*, No. 21-cr-47-RDM (Apr. 22, 2025), ECF No. 108-1.

[9] This strict reading of *Knote* may appear harsh on its face, and struck Justice Blackmun's *Republic National Bank* minority as "unrealistic" and potentially even "absurd." 506 U.S. at 90–92. But the political branches could take any

## B. The Court Is Unaware of Any Appropriation Statute That Would Allow Disbursal of Mr. Sullivan's Forfeited Funds

Because the Appropriations Clause applies to Mr. Sullivan's forfeited monies, they may be returned to him only if Congress has authorized their return by law. The Government does not, however, identify any statute potentially having that effect. Indeed, their only mention of *any* appropriation statute comes in a passing reference to *Republic National Bank*, in which Chief Justice Rehnquist discerned an appropriation from the interplay between three statutory provisions: 31 U.S.C. § 1304 authorizes the payment of "final judgments" where "payment is not otherwise provided for" and "the judgment . . . is payable under" any of several statutes, including 28 U.S.C. § 2414, which authorizes the payment of "final judgments rendered by a district court . . . against the United States . . . ." *Republic Nat'l Bank*, 506 U.S. at 95. And 28 U.S.C. § 2465(a) further provides that "[u]pon the entry of judgment for the claimant in any proceeding to condemn or forfeit property seized or arrested under any provision of Federal law . . . such property shall be returned forthwith to the claimant or his agent . . . ."

These statutes, however, afford no relief to Mr. Sullivan: Though he may have been pardoned, and his convictions may have been vacated, he has not been awarded anything resembling a "final judgment[] . . . against the United States." It is axiomatic that "a pardon does

---

of several different steps to facilitate the recovery of financial penalties by defendants whose convictions have been vacated. Of course, Congress could enact an appropriation statute providing for the return of assets that are held in the Treasury and which have not been disbursed to third parties, i.e. victims. Alternatively, arrangements could be made such that forfeited funds remain in the custody of the courts until a conviction becomes final, or that such funds remain in the custody of the relevant law enforcement agency in a non-Treasury account. In fact, based on the Government's representations, it appears that Mr. Sullivan's funds were held by the FBI—impliedly in an account not located within the Treasury—for more than two and a half years from the time of their initial seizure until after his conviction. Gov's Resp. at 1. Indeed, *Knote* itself discusses a viable alternative arrangement. *See* 95 U.S. at 155 (recounting that the Secretary of the Treasury asked the Attorney General whether "proceeds of [a] forfeiture deposited by the marshal in one of the public depositories to the credit of the United States, but not brought into the treasury by a covering warrant," could be refunded without an appropriation, which the Attorney General answered in the affirmative). In any case, the courts' duty to read the law "as written" outweighs the consideration of "consequentialist argument[s]" to the contrary. *Cf. Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 279 (2023).

12

not blot out guilt or expunge a judgment of conviction." *In re North*, 62 F.3d at 1437. And definitionally, the vacatur of a judgment *against* a criminal defendant is an act of erasure that is not tantamount to a judgment *for* that defendant against the United States. *See Acheson Hotels, LLC v. Laufer*, 601 U.S. 1, 15 (2023) (Jackson, J., concurring) ("Vacatur is a remedy that erases a judgment that has already been rendered."); *SDVF, LLC v. Cozzia USA LLC*, 132 F.4th 1114, 1118 (9th Cir. 2025) ("[A]n order vacating a judgment is not such a judgment."); *see also Vacatur*, Black's Law Dictionary (12th ed. 2024) (defining vacatur as "[t]he act of annulling or setting aside"). Even under the most generous construal of these statutory provisions, they provide no appropriation for the return of Mr. Sullivan's forfeited funds.

The Court knows of no other enactment providing an appropriation from the Treasury to return funds forfeited in a criminal case to the defendant upon vacatur of his or her conviction(s) or the receipt of a pardon. Accordingly, this Court cannot authorize the return of Mr. Sullivan's forfeited funds, nor may the Government lawfully return those monies on its own initiative.

## IV. CONCLUSION

This Court, as always, is bound both to obey binding precedent issued by the Supreme Court and by its oath to uphold the Constitution. The Appropriations Clause and *Knote* dictate that Mr. Sullivan's funds, which are incontestably in the Treasury, may not be withdrawn from it except as authorized by a statute enacted by Congress and signed by the President. As neither Mr. Sullivan nor the Government has adduced any appropriation bill under which he is authorized to receive the return of his forfeited funds, neither this Court nor the Government has the lawful authority to effectuate their return. An Order consistent with this Opinion shall issue separately.

Date: May 20, 2025

Royce C. Lamberth
United States District Judge